61 F.3d 1479
 Util. L. Rep. P 14,056
NORTHWEST PIPELINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Cascade Natural Gas Corporation, Northwest Natural Gas
Company, Intervenors.
NORTHWEST PIPELINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 94-9558, 94-9560.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 1, 1995.
 
 Toni M. Sutliff (Steven W. Snarr and Helen J. Edwards, with her on the brief), Northwest Pipeline Corp., Salt Lake City, UT, for petitioner.
 Joel M. Cockrell (Susan Tomasky, Jerome M. Feit and Joseph S. Davies, with him on the brief), F.E.R.C., Washington, DC, for respondent.
 Before ANDERSON and McKAY, Circuit Judges, and COOK,* District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 In this case, we must decide whether an order of the Federal Energy Regulatory Commission ("Commission") directing Northwest Pipeline Corporation ("Northwest") to refund to certain of its customers amounts by which they were overcharged violated the proscription against retroactive ratemaking. We hold that it did not. Accordingly, exercising jurisdiction pursuant to 15 U.S.C. Sec. 717r(b), we affirm the Commission's order directing Northwest to refund overcharges to the affected customers.
 
 BACKGROUND
 
 2
 Northwest operates an interstate natural gas transportation system which extends approximately 1500 miles, from New Mexico to the Canadian border. Like other interstate pipelines, Northwest historically operated its system by purchasing gas from producers, transporting these volumes from production fields through its transmission system, and selling the gas to distributors and end users. In 1985, however, consistent with Congressional intent expressed in the Natural Gas Policy Act, see 15 U.S.C. Secs. 3311-3432, the Commission issued Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R.), which launched a new era of "open access" transportation.[1] Under this new regime, the Commission hoped to foster competition in the industry by initiating the "unbundling" of the pipelines' transportation and merchant roles, thus allowing pipelines to provide transportation service for customers who bought gas elsewhere and had it shipped through the pipelines' transportation system.
 
 
 3
 This case involves two categories of Northwest customers: "bundled customers," those who are charged a unitary rate for their transportation and storage costs; and "unbundled customers," those who are charged separately for each component of service (such as transportation) which that customer utilizes. Approximately ninety-eight percent of Northwest's transportation service is unbundled; approximately two percent is bundled. Respondent's Br. at 3.
 
 
 4
 During the time period applicable to this proceeding,[2] rate schedules SGS-1 and LS-1 were part of Northwest's Tariff, 2d. Rev.Vol. No. 1 (Volume No. 1), and applicable to Northwest's bundled customers. Pursuant to this tariff, these bundled customers were not assessed any separate system fuel charges.[3]
 
 
 5
 In 1985, as part of its program to adapt the principles underlying Order No. 436, and to offer firm and uninterruptible open-access transportation, Northwest filed with the Commission a general transportation service tariff (Volume No. 1-A) which was applicable to its unbundled customers. Section 14.8 of this tariff required each shipper to pay, in addition to its transportation costs, a fuel reimbursement percentage (FRP) rate to compensate Northwest for the shipper's pro rata share of the system fuel. Section 14.8 of the tariff states:
 
 
 6
 14.8 Fuel Gas Reimbursement. In addition to the payments for transportation, Shipper shall reimburse Transporter for Shipper's pro rata share of fuel, including lost and unaccounted-for gas, required for transportation.... Fuel use requirements shall be determined using a factor calculated by dividing the total annual fuel and lost and unaccounted-for gas for Transporter's total transmission system, by the total annual volumes, including gas used for fuel and lost and unaccounted-for gas, transported through Transporter's transmission system, including volumes transported for Shipper. The fuel use requirements factor shall be determined for each year effective April 1 of each year based on the prior calender year's experience. The fuel use requirements factor shall be set forth on Sheet No. 202 of this Volume No. 1-A Tariff.
 
 
 7
 The fuel use requirements factor shall be applied to the volumes received from Shipper for transportation to determine Shipper's fuel gas volume reimbursement. Except when Shipper chooses to furnish such fuel gas volume in-kind, the charge to Shipper for fuel reimbursement for such fuel gas volume shall be determined using Transporter's average cost of purchased gas for the month of service.
 
 
 8
 65 FERC p 61,046, at 61,428 n. 2. R. at 154-55 n. 4. Under the terms of Section 14.8, Northwest could adjust the FRP charge annually in order to recover the actual system fuel use for the prior year.
 
 
 9
 The Commission approved the tariff and Northwest has, consistent with the terms of Section 14.8, submitted annual tariff sheets for filing setting forth its calculation of the FRP, based upon the prior year's fuel use experience. Under the terms of Section 14.8 the filed rate becomes effective April 1 of each year.
 
 A. Northwest's 1991 Filing
 
 10
 On February 28, 1991, pursuant to Section 14.8 of tariff Volume No. 1-A, Northwest submitted its 1991 FRP tariff sheets for filing, and requested an effective date of April 1, 1991. R. at 1-2. Northwest calculated the FRP for the unbundled customers, as it had since 1985,[4] by dividing the total amount of system fuel by the unbundled customers' total annual transportation volumes.
 
 
 11
 Pursuant to 18 C.F.R. Secs. 385.211, 385.214 (1994), one of Northwest's unbundled customers, Northwest Natural Gas Company ("Northwest Natural"), filed a protest to the proposed rate and moved to intervene in the proceeding. Northwest Natural asserted, inter alia, that Northwest had incorrectly calculated the FRP. Northwest Natural claimed that Northwest had been calculating the FRP by dividing the total system fuel by the total annual transportation volumes of the unbundled customers only, rather than using the "total annual volumes ... transported through Transporter's transmission system," which would have included both bundled and unbundled volumes.[5] Thus, according to Northwest Natural's protest, Northwest had been improperly excluding from the FRP calculation volumes transported for its bundled customers, resulting in a higher FRP charge to the unbundled customers.
 
 B. The Commission's Orders
 
 12
 On March 29, 1991, the Commission issued a Letter Order accepting and suspending Northwest's filing, pending final disposition, and directing Northwest to file an answer to Northwest Natural's protest. The Commission permitted the FRP filing to become effective April 1, 1991, but made the filing subject to refund and its acceptance conditional upon any action subsequently taken by the Commission. See Northwest Pipeline Corp., 54 FERC p 61,371 (1991); see also 15 U.S.C. Sec. 717c(e) (providing that Commission may suspend rate pending review); 18 C.F.R. Sec. 154.23 (1994) (acceptance for filing does not constitute Commission approval).
 
 
 13
 Thereafter, Northwest filed an answer to Northwest Natural's protest. Northwest Natural filed a response to Northwest's answer and on December 7, 1992, the Commission issued another Letter Order. The Commission ruled that Northwest had computed its FRP pursuant to its tariff provisions and that it had properly excluded from the calculation bundled storage volumes. Northwest Pipeline Corp., 61 FERC p 61,314 (1992).[6]
 
 C. The Commission's Order on Rehearing
 
 14
 Northwest Natural sought a rehearing. On October 8, 1993, the Commission granted Northwest Natural's request in part and issued an order addressing those claims upon which rehearing had been granted. The Commission first rejected Northwest Natural's claim that Northwest's failure to assess FRP charges against its bundled customers was violative of Section 14.8 of its tariff. The Commission concluded that Section 14.8 applied to all transportation services identified in Volume No. 1-A of Northwest's tariff, which covered unbundled transportation service, but that Section 14.8 did not apply to the rate schedules SGS-1 and LS-1 which are contained in Volume No. 1 of Northwest's tariff, and which cover bundled storage and transportation services. The Commission further stated that the rate schedules LS-1 and SGS-1 do not provide for an FRP to be paid for those services. Northwest Pipeline Corp., 65 FERC p 61,046, at 61,429 (1993). In short, the Commission ruled that the tariff provision applicable to unbundled customers required them to pay for system fuel, but that the tariff provision applicable to bundled customers did not contain such a requirement.
 
 
 15
 However, the Commission also ruled that Northwest's exclusion of the bundled SGS-1 and LS-1 volumes from the denominator of the FRP calculation had violated Section 14.8 of the tariff, Volume No. 1-A. According to the Commission, Section 14.8 "states clearly that in calculating the FRP the 'total annual volumes' should be included. There is no language excluding volumes transported pursuant to sales or storage services." Id. at 61,430. The Commission also observed, as a matter of contract construction, that had the phrase "total annual volumes" been intended to exclude those volumes transported pursuant to sales and storage services, then the language "including volumes transported for Shipper" contained in the antecedent clause would be superfluous. Id. The Commission concluded that "it must be the intent of this provision to include in the calculation of the FRP volumes other than those transported by shipper customers--and there is no language suggesting that storage volumes are to be excluded from those other volumes that must be included." Id.
 
 
 16
 Based upon the Commission's conclusion that the FRP had been erroneously calculated, it ordered Northwest to file a revised FRP which included the bundled transportation volumes in the calculation.[7] It further ordered Northwest to refund the overcharges back to the affected unbundled customers who had paid more than their pro rata share.[8]
 
 
 17
 Northwest's request for rehearing was denied by the Commission on July 21, 1994. Northwest Pipeline Corp., 68 FERC p 61,106 (1994). The Commission stated in its order denying rehearing that when bundled SGS-1 and LS-1 volumes are transported through the system, they "are no different than any other volumes moving in the transportation facilities--system fuel (including LUF) had to be expended to move the volumes. The FRP would not accurately reflect the percentage of gas used for fuel if any transportation volumes were excluded from the calculation for whatever reason." Id. at 61,585.
 
 
 18
 The Commission also rejected Northwest's argument that, by having to refund monies to its unbundled customers, while not recovering those costs from its bundled customers, it would undercollect its costs.[9] The Commission first noted that such a claim was premised upon the presumption that Northwest had not recovered "a proportionate share of fuel costs from customers of the SGS-1 and LS-1 rate schedules in the bundled rates charged under those schedules." Id.[10] The Commission went on to observe, however, that in any event Northwest had not been constrained from filing to recover fuel costs from its SGS-1 and LS-1 customers in a Section 4 (Natural Gas Act) general rate case. The Commission concluded that Northwest's failure to recover system fuel costs from its bundled customers was its own error, deeming it unacceptable "for Northwest to have violated the clear terms of its own tariff and overcharged some other customers (those using unbundled storage services) to make itself whole." Id.
 
 
 19
 Additional rehearing was requested by Northwest and, on September 16, 1994, the Commission issued its order granting rehearing in part and denying rehearing in part. Northwest Pipeline Corp., 68 FERC p 61,305 (1994). The Commission agreed that Northwest had changed Section 14.8, effective April 1, 1993, to remove the tariff language at issue in this case. Accordingly, the refund order was modified and limited to the period April 1, 1991, to March 31, 1992. The Commission also denied Northwest's claim that it should be allowed to recover the deficiencies from its bundled SGS-1 and LS-1 customers. The Commission observed that "Northwest's [Volume No. 1] tariff did not include a provision for billing its bundled SGS-1 and LS-1 storage customers for fuel use. Northwest's proposal, therefore, would not be a mere billing adjustment since there was to be no billing of fuel charges at all to those customers." Id. at 62,259. This appeal followed.
 
 DISCUSSION
 
 20
 I. The Commission's Interpretation of Section 14.8
 
 
 21
 The threshold issue that we must address is the Commission's interpretation of the language at issue in this case. The Commission ruled that Section 14.8 clearly states that "in calculating the FRP the 'total annual volumes' should be included. There is no language excluding volumes transported pursuant to sales or storage services." Northwest Pipeline Corp., 65 FERC p 61,046, at 61,430 (1993). Northwest argues that this reading is erroneous because the terms of Section 14.8 apply only to Volume No. 1-A of the tariff. Thus, according to Northwest, "the words 'total annual volumes' can mean only the total annual volumes of the transportation customers who are served pursuant to Volume No. 1-A." Appellant's Br. at 20.
 
 
 22
 We review the Commission's order pursuant to 15 U.S.C. Sec. 717r(b), which provides that the Commission's factual findings, if supported by substantial evidence, are conclusive. Moreover, under the Administrative Procedure Act, we may set aside agency action only if it is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. Sec. 706(2)(A); Woods Petroleum Corp. v. Department of Interior, 47 F.3d 1032, 1037 (10th Cir.), petition for cert. filed, 63 U.S.L.W. 3834 (U.S. May 10, 1995) (No. 94-1858). The "substantial evidence" test has been equated to the "arbitrary and capricious" standard of review. Colorado Interstate Gas Co. v. F.E.R.C., 904 F.2d 1456, 1459 (10th Cir.1990), cert. denied, 499 U.S. 936, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991); East Tenn. Natural Gas Co. v. F.E.R.C., 863 F.2d 932, 937 (D.C.Cir.1988). An agency decision may be arbitrary and capricious if it fails to consider important relevant factors or if there is no " 'rational connection between the facts found and the choice made.' " Woods Petroleum, 47 F.3d at 1037 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). In reviewing the agency's decision, a court is not free to substitute its own judgment for that of the agency, but must instead uphold the agency decision if there is a rational basis for that decision. Mount Evans Co. v. Madigan, 14 F.3d 1444, 1453 (10th Cir.1994); see also Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 644 (10th Cir.1990).
 
 
 23
 At the heart of the dispute in this case is the proper interpretation of the phrase "total annual volumes" contained in the FRP provision of Section 14.8 of Northwest's tariff Volume No. 1-A. Northwest claims one meaning--"total" applies to Volume 1-A volumes only; the Commission claims another--"total" applies to all volumes transported through the entire transmission system. Northwest argues that the Commission's interpretation of Section 14.8 is entitled to no deference because "FERC's language interpretation did not require any special expertise; and, in fact, its interpretation had no reasonable basis in fact and resulted in an error of law." Appellant's Br. at 18. We disagree.
 
 
 24
 In Williams Natural Gas Co. v. F.E.R.C., 3 F.3d 1544 (D.C.Cir.1993), the District of Columbia Circuit held that, under the principles pronounced in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Commission's interpretation of contractual language is entitled to deference. Williams, 3 F.3d at 1549. Relying on its prior holding in National Fuel Gas Supply Co. v. F.E.R.C., 811 F.2d 1563 (D.C.Cir.), cert. denied, 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987), the court reasoned that Congress had explicitly delegated to FERC " 'a broad range of adjudicative powers over natural gas rates,' and that Chevron's emphasis on deference to an agency's 'special competence' when there has been such a delegation 'implicitly modified earlier cases that adhered to the traditional rule of withholding deference on questions of contract interpretation.' " Williams, 3 F.3d at 1549 (quoting National Fuel, 811 F.2d at 1569-70) (internal citations omitted). Deference, of course, does not mean abdication of careful judicial review. A reviewing court will not "accept FERC's interpretation of a contract unless it is 'amply supported, both factually and legally.' " Baltimore Gas & Elec. Co. v. F.E.R.C., 26 F.3d 1129, 1135 (D.C.Cir.1994) (quoting Tarpon Transmission Co. v. F.E.R.C., 860 F.2d 439, 442 (D.C.Cir.1988)). Nevertheless, so long as the agency's interpretation is reasonable, the District of Columbia Circuit has held, a reviewing court must defer to that interpretation. Long Island Lighting Co. v. F.E.R.C., 20 F.3d 494, 497 (D.C.Cir.1994).
 
 
 25
 In this case, we adopt the reasoning of the District of Columbia Circuit as applied in Williams and the cases which have followed. Obviously, the Commission has vast experience in the interpretation of the language contained in natural gas tariffs--it reviews thousands of such filings annually.[11] The principles underlying Chevron--that a reviewing court should defer to agency expertise on questions within the scope of the agency's Congressionally delegated powers--clearly dictate that we defer to the Commission's interpretation of such language. See Natural Gas Clearinghouse v. F.E.R.C., 965 F.2d 1066, 1070 (D.C.Cir.1992).
 
 
 26
 Applying these principles to the present case, we believe the Commission's interpretation of the language at issue is entitled to our deference. As a general matter, the Commission applies the same canons of contract construction as would a reviewing court:
 
 
 27
 In construing what a tariff means, certain general principles apply. One looks first to the four corners of the entire tariff, considers the entire instrument as a whole, giving effect as far as possible to every word, clause and sentence, and attributes to the words the meaning which is generally used, understood, and accepted.
 
 
 28
 Columbia Gas Transmission Corp., 27 FERC p 61,089, at 61,166 (1984). In the present case, the Commission clearly has interpreted the language of Section 14.8 in accordance with these fundamental canons.
 
 
 29
 First, the Commission quite correctly notes that to give effect to Northwest's interpretation would require us to read the word "total," used three times in Section 14.8, as having two different meanings. In one case, "total" would refer to the total volume of system gas used for the entire transmission system; in the other case, "total" would be restricted to the total volume of gas transported under Volume No. 1-A of the tariff. The Commission's reading, on the other hand, ascribes to the word its ordinary meaning, and applies that meaning consistently throughout the provision in question. See Omnibank Parker Road, N.A. v. Employers Ins., 961 F.2d 1521, 1523 (10th Cir.1992).
 
 
 30
 Second, the Commission's reading gives effect and meaning to each provision of Section 14.8. See Tennessee Gas Pipeline Co. v. F.E.R.C., 17 F.3d 98, 104 (5th Cir.1994). Section 14.8 provides that "[i]n addition to the payments for transportation, Shipper shall reimburse Transporter for Shipper's pro rata share of fuel, including lost and unaccounted for gas, required for transportation." Under the Commission's reading, each unbundled customer does in fact pay its pro rata share of the system fuel, but no more. Under Northwest's proposed reading, however, each unbundled customer would pay more than its pro rata share of the system fuel costs because each would also be paying for some percentage of the system fuel expended on transporting volumes of gas for the bundled customers. Thus, Northwest's reading of Section 14.8 leads to a disfavored construction of the contract, rendering the term "pro rata" mere surplusage. See, e.g., United States Fidelity & Guar. Co. v. Morrison Grain Co., 999 F.2d 489, 493 (10th Cir.1993) (applying Kansas law); Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co., 962 F.2d 1484, 1489-90 (10th Cir.) (applying Utah law), cert. denied, --- U.S. ----, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992).
 
 
 31
 Finally, we agree with the Commission that Northwest's reading of Section 14.8 renders superfluous the clause "including volumes transported for Shipper" which is antecedent to "total annual volumes." The Commission's interpretation, on the other hand, gives meaning to this clause.
 
 
 32
 We note that the Commission's interpretation of Section 14.8 is not the only possible construction, nor necessarily even one that a court may have adopted had the issue arisen in the first instance in a judicial proceeding. See Salt Lake City v. Western Area Power Admin., 926 F.2d 974, 978 (10th Cir.1991). It is, however, a rationally based, reasonable construction, and is, therefore, entitled to our deference.
 
 II. The Refund Order
 
 33
 Having determined that the Commission reasonably interpreted Section 14.8 to require the inclusion of bundled transportation volumes in the FRP calculation, we now must consider whether the Commission properly ordered Northwest to refund the overcharges to its unbundled customers, or whether the order violated the proscription against retroactive ratemaking.
 
 A. The Statutory Framework
 
 34
 The primary purpose of the Natural Gas Act, 15 U.S.C. Secs. 717-717w ("NGA"), is "to protect consumers from exploitation at the hands of natural gas companies." Colorado Interstate Gas Co. v. F.E.R.C., 791 F.2d 803, 806 (10th Cir.1986) ("CIG ") (citing Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944)), cert. denied, 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987). In furtherance of this policy, Congress has declared that rates subject to regulation pursuant to the NGA are unlawful unless they are "just and reasonable." 15 U.S.C. Sec. 717c(a); see Office of Consumers' Counsel v. F.E.R.C., 783 F.2d 206, 213 (D.C.Cir.1986).
 
 
 35
 The NGA empowers the Federal Energy Regulatory Commission to regulate the rates charged by interstate natural gas pipelines. However, the NGA also prescribes how the Commission may exercise that power. Sea Robin Pipeline Co. v. F.E.R.C., 795 F.2d 182, 183 (D.C.Cir.1986). The Commission's power is set forth in two sections of the NGA relevant to this case--Section 4(e), which deals with ratemaking, and Section 5(a), which deals with Commission-ordered rate adjustment. 15 U.S.C. Secs. 717c(e), 717d(a); see United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956).
 
 
 36
 As a general rule, pipelines may only change their rates in the context of a formal rate case. Pursuant to Section 4 of the NGA, pipelines are required to file their rates and rate changes with the Commission in tariffs supported by detailed cost information. 15 U.S.C. Sec. 717c(c); 18 C.F.R. Sec. 154.63 (1994); see Consolidated Edison Co. v. F.E.R.C., 958 F.2d 429, 431 (D.C.Cir.1992). In so doing, the pipeline opens up its entire rate structure to scrutiny, see Federal Power Comm'n v. Tennessee Gas Transmission Co., 371 U.S. 145, 152, 83 S.Ct. 211, 215, 9 L.Ed.2d 199 (1962); CIG, 791 F.2d at 807, and, if challenged, it bears the burden of proving that its rate structure is just and reasonable. 15 U.S.C. Sec. 717c(e); see Sea Robin, 795 F.2d at 183.
 
 
 37
 Commission authority under Section 4 is limited to acceptance (in whole or in part) or rejection of the pipeline's proposed rate; the Commission is not empowered to substitute its own design for the rates proposed by the pipeline. Id.; see Public Serv. Comm'n v. F.E.R.C., 642 F.2d 1335, 1344 (D.C.Cir.1980), cert. denied, 454 U.S. 879, 880, 102 S.Ct. 360, 362, 70 L.Ed.2d 189 (1981). This restriction ensures that rates will be set in the first instance by the pipelines themselves. However, the Commission retains broad remedial authority under Section 4. It may accept the proposed rate conditionally, and suspend the rate for up to five months pending Commission investigation. 15 U.S.C. Sec. 717c(e). If the Commission determines, following such an investigation, that the filed rate is unjust and unreasonable, it may order refunds effective as of the date the proposed rate change became effective. 15 U.S.C. Sec. 717c(e); see Natural Gas Pipeline Co. of Am. v. F.E.R.C., 904 F.2d 1469, 1471 (10th Cir.1990). The D.C.Circuit has termed this refund procedure the "only statutory exception to [the NGA's general rule] prohibiting retroactive rate changes." East Tenn. Natural Gas Co. v. F.E.R.C., 863 F.2d 932, 941-42 (D.C.Cir.1988) (Wald, C.J.). This exception, according to the court, "arises in order to accommodate the realities of administrative delay." Id. at 942; see Natural Gas Pipeline Co., 904 F.2d at 1471. Thus, the refund procedure allows the pipeline to charge the proposed rate while Commission proceedings on the rate change are in progress, while at the same time providing notice to the pipeline that its rate ultimately may be subject to a refund order.
 
 
 38
 In contrast to Section 4 proceedings, proceedings under Section 5 are not initiated by the regulated entity, but instead are initiated by the Commission, upon its own motion, or upon the complaint of a third party. Under this section, the Commission examines rates already in effect and it may set aside and modify any rate which is determined, after hearing, to be "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. Sec. 717d(a). Under Section 5(a), the moving or complaining party bears the burden of proving that the previously established rate is unjust and unreasonable, see CIG, 791 F.2d at 806, and any relief from an unjust rate ordered by the Commission is prospective only; it may not have retroactive effect. See 15 U.S.C. Sec. 717d(a) (when Commission finds rate unreasonable, it "shall determine the just and reasonable rate ... to be thereafter observed and in force"); CIG, 791 F.2d at 806.
 
 
 39
 The relationship between Sections 4 and 5 of the NGA was described by the Supreme Court in United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956):
 
 
 40
 The powers of the Commission are defined by Secs. 4(e) and 5(a). The basic power of the Commission is that given it by Sec. 5(a) to set aside and modify any rate or contract it determines, after hearing, to be "unjust, unreasonable, unduly discriminatory, or preferential." This is neither a "rate-making" nor a "rate-changing" procedure. It is simply the power to review rates and contracts made in the first instance by the natural gas companies and, if they are determined to be unlawful, to remedy them. Section 5(a) would of its own force apply to all the rates of a natural gas company, whether long-established or newly changed, but in the latter case the power is further implemented by Sec. 4(e). All that Sec. 4(e) does, however, is to add to this basic power, in the case of a newly changed rate or contract (except "industrial" rates), the further powers (1) to preserve the status quo pending review of the new rate by suspending its operation for a limited period, and (2) thereafter to make its order retroactive, by means of the refund procedure, to the date the change became effective. The scope and purpose of the Commission's review remains the same--to determine whether the rate fixed by the natural gas company is lawful.
 
 
 41
 Id. at 341, 76 S.Ct. at 379. While the underlying goal of both sections is the same--to protect the customer against unjust and unreasonable rates--each provision is responsive to different circumstances, and is subject to different restrictions; the Commission is "not free to blend, or pick and choose at will between its sections 4 and 5 authority." Sea Robin, 795 F.2d at 183. "While Sec. 4's refund provision protects the customers from a rate that is unreasonably high when filed (examined as of the filing), Sec. 5's requirement that relief be prospective only assures the utility that rates passing scrutiny under Sec. 4 will not be undone." Associated Gas Distribs. v. F.E.R.C., 898 F.2d 809, 810 (D.C.Cir.1990) (Williams, J.) (concurring in denial of rehearing and rehearing in banc ), cert. denied, 498 U.S. 907, 111 S.Ct. 277, 278, 112 L.Ed.2d 232, 233 (1990).
 
 B. The Present Case
 
 42
 The controversy in this case centers around whether the Commission's order was issued pursuant to Section 4 or Section 5. Northwest filed its general tariff in 1985 in the context of a full Section 4 rate case. Included in the general filing was the fuel reimbursement clause contained in Section 14.8. Northwest takes the position that once the Commission accepted the general filing, then the rates contained therein became established and could only be challenged subsequently in the context of a Section 5 proceeding. The annual filing of FRP tariff sheets, Northwest argues, is merely ministerial; an annual adjustment to the already approved FRP mechanism. Therefore, according to Northwest, Northwest Natural's 1991 challenge to the FRP calculation (and the Commission's subsequent action) could only have arisen in the context of a challenge to an already existing rate; a challenge which could only have been initiated pursuant to Section 5(a). Thus, Northwest concludes, even if the Commission determined that the FRP had been calculated erroneously, it could only order prospective relief, and its order that Northwest refund overcharges back to April 1, 1991 amounts to retroactive ratemaking, in direct violation of the NGA. See Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 578, 101 S.Ct. 2925, 2930-31, 69 L.Ed.2d 856 (1981) (rule against retroactive ratemaking "bars 'the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate.' " (quoting City of Piqua v. F.E.R.C., 610 F.2d 950, 954 (D.C.Cir.1979))); Natural Gas Pipeline Co., 904 F.2d at 1473-74; Office of Consumers' Counsel v. F.E.R.C., 826 F.2d 1136, 1138-39 (D.C.Cir.1987).
 
 
 43
 The Commission, on the other hand, argues that the annual updates to Northwest's FRP, while not formal Section 4 general rate case filings, nevertheless were filed pursuant to Section 4.[12] As such, and in light of the fact that the 1991 and 1992 FRP filings at issue were "accepted and suspended" by the Commission and explicitly made subject to refund, the Commission argues that the refund order is clearly within the agency's Section 4 authority.
 
 C. Analysis
 
 44
 Neither the NGA nor Commission regulations specifically address FRP adjustments. Thus, we must determine whether the annual FRP adjustments filed by Northwest constitute a proposed rate change, thus triggering Commission review under Section 4(e), or whether "the Commission seeks to impose a rate change not proposed by the company," in which case Section 5(a) is applicable. ANR Pipeline Co. v. F.E.R.C., 771 F.2d 507, 513 (D.C.Cir.1985).
 
 
 45
 As an initial matter, we note that the form of Northwest's annual FRP filings comply with filing requirements set forth in Commission regulations implementing Section 4.[13] Furthermore, the Commission's response to the filing--accepting and suspending the new rate--is consistent with Commission action which may be taken pursuant to Section 4. See 15 U.S.C. Sec. 717c(e). Thus, we believe that both Northwest and the Commission viewed the annual FRP adjustments as rate changes filed pursuant to Section 4.
 
 
 46
 The phrase "FERC gas tariff," as used in Northwest's form notice, filed pursuant to 18 C.F.R. Sec. 154.28 (1994), is defined as "a compilation, either in book form or on electronic media, of all the effective rate schedules of a particular natural gas company." 18 C.F.R. Sec. 154.14 (1994). Thus, in its annual FRP filings Northwest sought a change to its effective rate schedule. By the clear language of the NGA, any such change must be filed pursuant to Section 4. See 15 U.S.C. Sec. 717c(d).
 
 
 47
 Notwithstanding this prior course of conduct, Northwest now claims that the annual FRP filings were not made pursuant to Section 4. Northwest argues that Commission approval of a "rate" is not always confined to the approval of a specific numeric value, but may instead extend to the approval of a calculational formula or "rate rule" which, once approved, is established for purposes of the NGA. While specific numeric input data to such a formula may vary from year to year, Northwest's position is that the formula itself does not change and therefore may be attacked only in the context of a Section 5 proceeding. To be sure, there is some support for such a position. See Transwestern Pipeline Co. v. F.E.R.C., 897 F.2d 570, 578-79 (D.C.Cir.), cert. denied, 498 U.S. 952, 111 S.Ct. 373, 112 L.Ed.2d 335 (1990). But see Public Serv. Co. v. F.E.R.C., 832 F.2d 1201, 1225 (10th Cir.1987); Electrical Dist. No. 1 v. F.E.R.C., 774 F.2d 490, 492 (D.C.Cir.1985) (holding that rate is "fixed" within the meaning of the Federal Power Act once the rate itself is specified).
 
 
 48
 However, we believe that in the context of this case, Northwest's argument misses the point. The Commission's order did not effect a change in the mechanism by which the FRP is calculated. Rather, it simply directed Northwest to calculate the FRP correctly, in compliance with Section 14.8. And, as we have just held, we defer to the Commission's interpretation of what constitutes a "correct" FRP calculation. Thus, the Commission's order did not direct Northwest to calculate the FRP differently, it simply ordered Northwest to calculate the FRP correctly. Section 5, therefore, simply finds no application in this case.
 
 
 49
 Nor do we accept Northwest's argument that the Commission's refund order violates the filed rate doctrine.[14] "The filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service." Natural Gas Clearinghouse v. F.E.R.C., 965 F.2d 1066, 1075 (D.C.Cir.1992); see Columbia Gas Transmission Corp. v. F.E.R.C., 895 F.2d 791, 797 (D.C.Cir.), cert. denied, 498 U.S. 907, 111 S.Ct. 278, 279, 112 L.Ed.2d 233 (1990). Certainly, this same reasoning is especially applicable where, as here, it is the pipeline, rather than the natural gas customer, who is put on notice that its requested rate increase may be subject to refund. In this case, Northwest was on notice when the Commission accepted and suspended the 1991 FRP filing that a refund may be ordered. Thus, the Commission's order was not in violation of the filed rate doctrine.
 
 
 50
 Having determined that the Commission's order was not issued pursuant to Section 5, and that the order did not violate the filed rate doctrine, we now must consider whether the Commission properly exercised its refund authority pursuant to Section 4. We conclude that it did.
 
 
 51
 Although neither Commission regulations nor the NGA specifically address FRPs, the Commission has adopted an analogous adjustment mechanism for purchase gas adjustments ("PGA"). The PGA proceeding allows a pipeline to facilitate recovery of costs by including a purchase gas adjustment clause in the rates it files with the Commission. See 18 C.F.R. Secs. 154.301-154.310 (1994). Qualified companies may then adjust their rates to reflect changes in costs by submitting PGA filings quarterly.[15] In exchange, the companies must agree to submit all costs and revenues to the Commission for a full scale Section 4 review at least every three years. Significantly, rate changes ordered by the Commission pursuant to a Section 4 review are retroactive. See South Carolina Pipeline Corp. v. F.E.R.C., 868 F.2d 650, 651 (3d Cir.1989); Associated Gas, 706 F.2d at 345-46; Laclede Gas Co. v. F.E.R.C., 670 F.2d 38, 41-42 (5th Cir. Unit A 1982).
 
 
 52
 The PGA adjustment mechanism allows a pipeline to adjust its rates on a quarterly basis without the necessity for a full scale Section 4 rate case. This allows for more streamlined, less cumbersome, routine adjustments to recoverable costs. However, a pipeline employing the PGA adjustment mechanism must nevertheless justify its periodic adjustments, and the pipeline is on notice that a refund may be ordered if it fails to carry its burden. See Associated Gas, 706 F.2d at 346 ("Because the PGA procedure is conducted pursuant to the Commission's power under section 4, the customers of a pipeline are entitled to file a complaint concerning the lawfulness of a pipeline's PGA rate increase.").
 
 
 53
 In like fashion, the FRP mechanism allows for annual adjustment to a pipeline's system fuel costs. The expedited nature of this proceeding, however, does not mean that the adjustment should escape close scrutiny by the Commission pursuant to Section 4. We are unable to discern any relevant distinction between quarterly PGAs and annual FRP adjustments which would warrant subjecting one to Section 4 scrutiny, while treating the other simply as a ministerial filing. Thus, we believe the reasoning of the District of Columbia Circuit--that the filing of a PGA is a filing made pursuant to Section 4--is equally appropriate as applied to an annual FRP filing. Both mechanisms effect a change in the rate a customer pays, and therefore, by the clear terms of the NGA, both are appropriately subject to review under Section 4(e).
 
 
 54
 Practical considerations further support our holding. In this case, Northwest was put on notice, once the Commission accepted and suspended the 1991 tariff sheets, that its proposed change to the FRP ultimately might be deemed unjust and unreasonable and made subject to refund.[16] This is precisely the goal of Section 4--to put the pipeline on notice that the rate may be subject to refund, while allowing the rate to become effective pending completion of the Commission's review. Such an approach recognizes the inherent delay in administrative review, while granting the pipeline some leeway; that is, while the pipeline bears the ultimate burden of justifying the rate increase as being just and reasonable, the "accept and suspend" provision of Section 4(e) embodies an implicit presumption that, in most cases, the pipeline will in the end be able to satisfy that burden.
 
 
 55
 Northwest's position, on the other hand, would likely lead to administrative paralysis. Because any Commission order directing a pipeline to comply with the terms of its tariff could only have prospective effect, there would be no suspension of rates. Rather, the Commission would be forced to examine the FRP adjustment, hold hearings, and conduct its investigation prior to acceptance or rejection of the FRP adjustment. Such a cumbersome process would invariably lead to the same type of "pancaking" of FRP adjustments that the PGA mechanism was intended to remedy in the context of purchase gas adjustments. See Associated Gas, 706 F.2d at 345.[17]
 
 
 56
 Finally, we believe that Northwest's position runs completely counter to the policy of the Natural Gas Act. The "rate" in question in this case is Northwest's annual adjustment to the FRP. There is no question that the charge to a given unbundled customer changes from year to year, based on the total fuel used to operate the system, the amount of lost and unaccounted for gas, and the total volume of gas transported through the pipeline. There also can be no question that input data for the FRP calculation lies within the exclusive control of Northwest Pipeline; that is, Northwest controls how much system gas is lost or otherwise unaccounted for, and Northwest controls how much fuel is used in system operations. The pipeline is permitted to recover these costs from its customers, but it is always under the obligation in the first instance to ensure that its costs are prudently incurred and that its rates are just and reasonable. If Northwest mismanages its operation and loses an inordinate amount of fuel one year or incurs unusually high transmission costs, should the burden fall to the customer to show that such costs are unjust and unreasonable, or should the burden rest with the pipeline to explain its higher-than-usual costs and justify why it is nonetheless entitled to recover these costs? We believe that the latter approach more faithfully embodies the policy of the NGA "to protect consumers from exploitation at the hands of natural gas companies." CIG, 791 F.2d at 806 (citing Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944)).
 
 
 57
 We simply are unable to subscribe to Northwest's proposal that a customer challenging the annual FRP filing bears the burden of establishing that the rate is unjust and unreasonable, a burden that the customer would bear under Section 5(a). Rather, we conclude that the policy underlying the NGA, as reflected in the plain language of the statute, requires the natural gas pipeline to justify its rate change in the context of a Section 4 proceeding--whether the rate change is part of an adjustment to the overall rate structure, or whether the rate change merely is part of an annual FRP adjustment.
 
 
 58
 In sum, therefore, when Northwest filed its tariff sheets requesting a change in its FRP on February 28, 1991, it did so pursuant to Section 4 of the NGA. The filing was accepted and suspended by the Commission pursuant to Section 4(e), given an effective date of April 1, and explicitly made subject to refund. Consequently, the Commission's order that Northwest refund overcharges from the effective date was properly issued pursuant to the Commission's refund authority under Section 4(e). Further, because the Commission's refund order did not effect a modification to Northwest's rate, or the FRP calculational mechanism, the Commission's order cannot be considered as having issued pursuant to Section 5. And finally, because Northwest was on notice that its filed FRP adjustment may be subject to refund, the Commission's ordering of a refund did not violate the rule against retroactive ratemaking.
 
 
 59
 For the foregoing reasons, we AFFIRM the order of the Commission.
 
 
 
 *
 Honorable H. Dale Cook, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 Implementation of the open access policy was initiated with the issuance of Order Nos. 500 and 636. See 52 Fed.Reg. 30,334 (1987); see also American Gas Ass'n v. F.E.R.C., 912 F.2d 1496 (D.C.Cir.1990), cert. denied, 498 U.S. 1084 (1991)
 
 
 [2]
 The bundled service that Northwest provided eventually was unbundled as part of the company's restructuring efforts. Appellant's Br. at 5
 
 
 [3]
 As natural gas is transported through a pipeline, a fraction is lost due to system leakage. This is known as lost and unaccounted-for fuel ("LUF"). Additionally, a fraction of the gas passing through the system is diverted and used to run system equipment. This is known as transportation fuel. Throughout this opinion, we refer to the LUF and transportation fuel collectively as "system fuel."
 
 
 [4]
 In its 1991 filing, Northwest represented that it had "followed the same fuel reimbursement percentage calculation procedures used in its prior annual fuel reimbursement filings since the Commission '... found Northwest's filings were consistent with its filed tariff ...' and 'any changes to the mechanism can be raised in Northwest's next Section 4 rate proceeding.' (Slip.Op. at p. 4)." R. at 1
 
 
 [5]
 Northwest does not dispute that it calculated the FRP by "dividing the total annual fuel and unaccounted-for gas for the pipeline's system by the total annual volumes transported under various Volume No. 1-A transportation rate schedules during the prior calendar year." Appellant's Br. at 6
 
 
 [6]
 Northwest Natural raised the same protest in Northwest's 1992 FRP filing made in Docket No. TM92-7-37-000. On March 30, 1992, the Commission issued a Letter Order accepting and suspending Northwest's filing making it subject to refund and the final disposition of the 1991 filing under Docket No. TM91-6-37-001. See Northwest Pipeline Corp., 65 FERC p 61,046, at 61,429 n. 6 (1993). This order consolidated the two cases
 
 
 [7]
 The Commission declined to address in this docket the issue raised by Northwest Natural as to the unfair, unreasonable, or discriminatory nature of the treatment between shippers of different rate schedules. The Commission held that the discrimination issues would more appropriately be addressed in Northwest's Order No. 636 restructuring proceeding. Northwest Pipeline Corp., 62 FERC p 61,284 (1993)
 On December 23, 1993, a settlement agreement was approved in Docket No. RP93-5-011 which unbundled the transportation components of rate schedules SGS-1 and LS-1. This settlement resolved the discrimination issues raised by Northwest Natural and, therefore, the allegations of discrimination at issue in this matter became moot. See Northwest Pipeline Corp., 68 FERC p 61,106 at 61,584 (1994).
 
 
 [8]
 The Commission ordered the refund from April 1, 1991, the effective date that Northwest's FRP filing had been accepted and suspended, to the effective date of the revised FRP. Northwest Pipeline Corp., 65 FERC p 61,046, at 61,430 (1993). Both parties agree that the Commission could not have ordered the refund of any overcharges prior to April 1, 1991, without violating the proscription against retroactive ratemaking
 
 
 [9]
 The net effect of the Commission's order was that Northwest could recover only 98% of its system fuel costs from its unbundled customers (who, as noted, make up 98% of Northwest's transmission service). Undeniably, absent some other mechanism by which Northwest could recover the additional 2% from its bundled customers, Northwest stood to incur a loss on its system fuel costs
 
 
 [10]
 At oral argument, counsel for Northwest stated that in fact there was a system fuel recovery mechanism built in to the bundled rate structure, but that the record was incomplete on that issue. Assuming the accuracy of this representation, we find Northwest's position problematic. It seeks to recover 100% of its system fuel costs from the unbundled customers in this proceeding, claiming that it will underrecover its fuel costs and incur substantial loss if it is unable to do so because it cannot recover the additional 2% from its bundled customers. Yet, at the same time, in order to deflect a claim that it discriminates, Northwest maintains that it does recover system fuel costs from its bundled customers
 
 
 [11]
 Counsel for the Commission noted at oral argument that Northwest's analysis of Sections 4 and 5 "would overturn the way the Commission acts a thousand times a year for the last fifty years."
 
 
 [12]
 The Commission claims that this court is without jurisdiction to decide this issue because Northwest failed to raise it in a timely application for rehearing to the Commission. See Malta Irrigation Dist. v. F.E.R.C., 955 F.2d 59, 65 (D.C.Cir.1992). We disagree
 Northwest filed two requests for rehearing. See R. at 132, 166; see also Northwest Pipeline Corp., 68 FERC p 61,305 (1994); Northwest Pipeline Corp., 68 FERC p 61,106 (1994). In both requests, Northwest raised the issue that the Commission's order amounted to retroactive ratemaking. See R. at 167 ("[T]he Commission incorrectly invoked the doctrine of retroactive ratemaking...."); see also R. at 139-40.
 
 
 [13]
 For example, Northwest's filings were submitted pursuant to 18 C.F.R. Part 154, that section of the Commission's regulations governing the filing of rate tariffs and schedules; Northwest specifically stated in its annual tariff sheets that the purpose of the filing was to "file a new Fuel Reimbursement Percentage (FRP)," R. at 1 (emphasis added); see R. at 200; Northwest submitted a filing fee, in accordance with 18 C.F.R. Part 385; Northwest submitted a form "Notice of Proposed Change in FERC Gas Tariff" and computer disk, as required by 18 C.F.R. Sec. 154.28; Northwest submitted its annual filing thirty days prior to the requested effective date, in compliance with the notice requirements of 18 C.F.R. Sec. 154.22 (1994) and 15 U.S.C. Sec. 717c(d); and in compliance with 18 C.F.R. Sec. 154.28 (1994), Northwest's form notice directed parties interested in protesting the filing to file a motion to intervene and protest with the Commission
 
 
 [14]
 As the Supreme Court has explained, the "filed rate doctrine" forbids a regulated entity from charging "rates for its services other than those properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co., 453 U.S. at 577, 101 S.Ct. at 2930
 
 
 [15]
 The filings must include detailed costing information including each pipeline purchase by contract, contract date, projected volume, rates to be paid, and the total cost of the purchased gas under the contract for the period encompassed by the filing. See Associated Gas Distribs. v. F.E.R.C., 706 F.2d 344, 346-47 (D.C.Cir.1983)
 
 
 [16]
 We note here that the Commission's orders do not refer to the incorrectly calculated FRP as unjust and unreasonable. However, a charge which is erroneously calculated, in violation of the tariff provision, and which results in a higher charge to the natural gas customer, is inherently unjust and unreasonable
 
 
 [17]
 The court in Associated Gas defined pancaking as the piling up of rate increase filings such that new ones were filed before old ones became effective. Associated Gas, 706 F.2d at 345