**MALTA IRRIGATION DISTRICT, et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Petitioners,**

**Continental Hydro Corporation, Intervenor.**

**Nos. 90–1584, 90–1606 and 91–1094.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 7, 1992.

Decided Feb. 7, 1992.

James B. Liberman, Washington, D.C., with whom Matthew W. Knierim, Glasgow, Mont., was on the brief, for petitioners Malta Irrigation District, et al. in 90–1584 and 91–1094 and intervenors in 90–1606.

Michael R. Waller, with whom Jonathan W. Gottlieb and Timothy M. Murphy, Washington, D.C., were on the brief, for petitioners Liberty County, et al. in 90–1606.

Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Solicitor, Washington, D.C., were on the brief, for respondent in 90–1584, 90–1606 and 91–1094. Katherine Waldbauer also entered an appearance for respondent.

David B. Ward, with whom Elizabeth A. Ward, Washington, D.C., and Garry B. Watzke, Boston, Mass., were on the brief, for intervenor, in 90–1584, 90–1606, and 91–1094.

Before RUTH BADER GINSBURG, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The Federal Power Act instructs the Federal Energy Regulatory Commission (FERC or Commission) to accord "municipalities" a preference as applicants for permits and licenses to develop hydroelectric power projects. See 16 U.S.C. §§ 796(7), 800(a). This case, involving a project to develop the Tiber Dam in Liberty County, Montana, concerns FERC's determination that the municipal preference provision was jointly abused by petitioners Liberty County, Town of Chester, and MRR, a private developer. The controversy centers on the remedy ordered by the Commission.

We conclude that, upon resolving the municipal preference abuse issue against Liberty/Chester/MRR, FERC appropriately sanctioned these parties by dismissing their license application and barring them from competing for the Tiber Dam site for one year. We further conclude that the Commission did not exercise its remedial discretion in an arbitrary way when it declined to favor municipalities Malta Irrigation District, et al., joint license applicants for the Tiber Dam project and petitioners herein, and instead granted a preliminary permit to Continental Hydro Corporation, a private developer, intervenor herein, and first party to seek a permit for the site. Accordingly, we affirm the Commission's orders in all respects.

I.  Background

A.  Regulatory Setting

Under Part I of the Federal Power Act (FPA), 16 U.S.C. §§ 791a–823b, FERC

awards licenses to construct hydroelectric projects on federal land or waters through a two-stage process: the preliminary permit stage, and the licensing stage. *See* 16 U.S.C. § 797(e), (f); *City of Bedford v. FERC*, 718 F.2d 1164, 1165–66 (D.C.Cir. 1983). In the preliminary permit stage, which figures prominently in this case, prospective developers submit rudimentary information about their intended projects to FERC's Director of Hydropower Licensing. *See id.* at 1166; 16 U.S.C. §§ 797(f), 798. A timely filed preliminary permit application by a statutorily defined municipality, the Act directs, must be preferred to an equally adequate proposal by a private developer. *See id.* §§ 796(7), 800(a); 18 C.F.R. § 4.37(b)(4). In choosing among private applicants or among municipalities when, as is typically the case, no proposal is clearly superior, the Commission grants the permit to the first-filing applicant. *See* 18 C.F.R. § 4.37(b)(2); *City of Dothan v. FERC*, 684 F.2d 159 (D.C.Cir.1982) (upholding first-to-file policy).

Because the permit is intended to induce holders to undertake the research and investment necessary for the preparation of a license application, the permittee is accorded priority at the licensing stage. All interested parties may apply at that stage. A license applicant need not have filed for a permit. However, the permittee who timely files for a license receives a preference over equally qualified applicants, even over municipal applicants and ahead of private developers who filed their license applications earlier. *See* 16 U.S.C. § 798; 18 C.F.R. § 4.37(c)(1).

Grants and denials of preliminary permits are considered final Commission action reviewable by a court of appeals.[1] *See* 16 U.S.C. § 825*l*; *City of Bedford*, 718 F.2d at 1167–68. FERC policy, however, upheld by this court, postpones until the *license* stage any Commission inquiry into

whether an applicant claiming municipal preference is actually so entitled. *See id.* at 1168–70 (upholding Commission policy); *City of Summersville*, 17 FERC ¶ 61,030 (1981) (stating rationale).

## B. Facts

On October 16, 1980, Continental Hydro Corporation (Continental) filed an application for a preliminary permit to develop a hydroelectric facility at the Tiber Dam. By regulation, the deadline for filing competing applications was January 26, 1981. Two were received: one from Central Montana Electric Generation and Transmission Cooperative, Inc. (Central Montana), a private developer; and one from a partnership between Liberty County, Montana, a "municipality," and Montana Renewable Resources (MRR), a private developer.[2] Liberty/MRR sought to qualify as a "municipality," a status that would command preference in the permit contest. Both Continental and Central Montana asserted that Liberty/MRR, as a "hybrid" applicant, could not claim municipal preference.

On September 16, 1981, in *City of Fayetteville Public Works Comm'n*, 16 FERC ¶ 61,209, FERC declared definitively that public/private hybrids, such as Liberty/MRR, were not entitled to municipal preference. The next day—well after the deadline for filing permit applications had passed—Liberty notified the Commission that MRR had "withdrawn" from the partnership; a few days later, the Liberty application was "amended" to include the Town of Chester, Montana as co-venturer. MRR executives, Liberty/Chester disclosed, would remain on board as the new partnership's "agents." Continental and Central Montana protested that the municipal preference had been misused. Central Montana specifically urged that the Commission treat Liberty/Chester as a new applicant—and hence, an untimely one.[3]

---

1. Section 825*l* (a) requires that an application for rehearing be filed with FERC before a court of appeals may review an FERC order.

2. Central Montana is not a party to this review proceeding. As a matter of corporate law, "MRR" is an entity distinct from Montana Re-

newable Resources; for purposes of this case, however, the distinction is not significant, and we refer to them interchangeably.

3. A rule establishing that a change in the identity or status of an applicant *does* change the filing date of an application came into effect later that year. *See* 18 C.F.R. § 4.35. Liberty's

Instead, FERC's Licensing Director accepted the "amended" application; stressing the municipal preference, the Director awarded Liberty/Chester a twenty-four-month preliminary permit. 17 FERC ¶ 62,174 (1981). Any problem of municipal abuse, that decision announced, would await correction at the licensing stage, where the permittee would lose priority status if it were shown that the permittee's plan in fact depended upon the participation of a private co-venturer. FERC simultaneously dismissed the applications of Continental and Central Montana, and gave the standard instruction that the Tiber Dam permit decision was "final unless a petition appealing it to the Commission is filed within 30 days from the date of its issuance." Neither Continental nor Central Montana appealed the permit decision to the Commission.

Having won at the first stage, Liberty/Chester consulted with FERC staff on the role, if any, its not-quite-silent partner, MRR, might play, in light of *Fayetteville*. When Commission staff responded that guidelines interpreting *Fayetteville* had not been formulated, Liberty/Chester opted to surrender its permit, but synchronized (with help from FERC staff) that act with the filing of a license application on behalf of Liberty/Chester/MRR (when appropriate, Liberty).[4] While the priority status of permittee was thereby abandoned (and with it, municipal preference for Liberty/Chester), the new entity ensured that it would be "first in time," potentially a determinative factor at the licensing stage.

The two permit-stage losers, Continental and Central Montana, did not file license applications, but both lodged protests to Liberty's license application, asserting, as they initially did in 1981, that the municipal

preference had been abused. Continental's submission urged FERC to remedy the abuse by granting Continental, as first to file, the preliminary permit earlier denied to it. Claiming municipal status, a newcomer, Malta Irrigation District, in conjunction with several other Montana irrigation districts (collectively, Malta), timely filed a competing license application in early 1983.[5] Malta had not participated at the preliminary permit stage.

## C. FERC's Remedy

In October 1987, in a preliminary non-reviewable order, FERC declared that Liberty had apparently misused the municipal preference. *See* 41 FERC ¶ 61,016. The abuse, the Commission said, lay in the deliberate coordination of the 1982 Liberty/Chester permit surrender with the Liberty/Chester/MRR license application filing. The practical effect of the maneuver, FERC explained, was indistinguishable from the effect sought by more flagrant abusers: transfer of a competitive advantage, statutorily conferred on a "municipality," to a party not itself qualified for a boost. *See generally Gregory Wilcox*, 24 FERC ¶ 61,317 (1983) (*Uncompahgre I*) (establishing rebuttable presumption that municipal preference is abused by coordinated permit surrender/license application filing).[6] Following the course charted in *Uncompahgre* and its progeny, FERC gave Liberty/Chester/MRR an opportunity to demonstrate that it had not, in fact, coordinated with Liberty/Chester and to show cause why the *Uncompahgre* remedy—license application dismissal and preclusion from competing for the same site for one year, *see Gregory Wilcox*, 26 FERC ¶ 61,113 (1984) (*Uncompahgre II*)—would not be appropriate.

amendment was processed under the earlier-prevailing regulations.

4. FERC staff dated "July 13, 1982" the June 15 application of Liberty/Chester/MRR so that it would coincide with the publication in the *Federal Register* of notice that the Commission had accepted the Liberty/Chester permit surrender.

5. The other districts were Glasgow, Dodson, Zurich, Harlem, Fort Belknap, Paradise Valley,

and Alfalfa Valley. A timely application for a license was also received from another municipality, the City of Gillette, Wyoming. Gillette is not a party to this review proceeding.

6. The *Uncompahgre* decisions were ultimately vacated on grounds not relevant here. *See Uncompahgre Valley Water Users Ass'n v. FERC*, 785 F.2d 269 (10th Cir.), *cert. denied*, 479 U.S. 829, 107 S.Ct. 112, 93 L.Ed.2d 60 (1986).

In a 1990 order, FERC made the decision principally challenged in this case. *See* 50 FERC ¶ 61,099. Rejecting Liberty's arguments grounded on its asserted good faith and reliance on the advice of Commission staff, FERC reiterated that municipal abuse determinations turn on the receipt of an undeserved advantage, and not on an applicant's malign (or benign) motive. The Commission then rejected Liberty's request for a tempered judgment in view of (1) Liberty's asserted good faith; (2) a trend in Commission decisions toward greater toleration of public-private cooperation; (3) the funds Liberty had expended developing the project; (4) inordinate FERC delay in disposing of the abuse charges; and (5) the environmental and technological superiority of Liberty's proposal. Deterring municipal preference abuse, the Commission answered, best serves the competitive process—and thereby the purposes of the Federal Power Act. In keeping with *Uncompahgre II*, FERC dismissed Liberty's license application and precluded Liberty, for one year, from newly applying for the Tiber Dam license.

FERC further announced that it had reached back to the 1980 permit contest and had reinstated the previously dismissed permit applications of Continental and Central Montana. That measure left Malta, which had not entered the fray until the license application stage, out of the starting line. Acknowledging that prior decisions, *e.g.*, *Uncompahgre II*, had remedied municipal abuse by opening to all interested parties an entirely new round of competition, FERC emphasized that Liberty/Chester did not enter the competition as a municipal applicant until *after* the deadline for submitting permit applications had passed. Because FERC could conclude with certainty that no potentially superior permit applications had been "chilled," a wholly new contest, the Commission believed, would be inappropriate: in this case, FERC judged, the most conspicuous victim of the unjustified preference—Continental—was the party with the strongest claim

for priority. If Continental could not reclaim first place in the permit contest, the Commission reasoned, the remedy would leave without muscular relief the party who clearly would have achieved the head start but for the advantage Liberty improperly gained.

Turning to Malta's claimed reliance on Continental's "abandonment" of its permit application, FERC emphasized, first, that under the prevailing legal regime, any attempt by Continental to challenge the permit award to Liberty/Chester would have been futile. In addition, the Commission observed, Malta had been on notice from the start that unresolved issues of municipal preference abuse were hovering over the Tiber Dam site. Accordingly, FERC dismissed Malta's application for a license, without prejudice to a renewed application once the permittee had been accorded the opportunity to pursue project plans.[7] In a follow-up 1990 proceeding, the Commission awarded Continental a preliminary permit. 53 FERC ¶ 62,163.

## II. Analysis

### A. Liberty/Chester/MRR

Liberty no longer counters in this review proceeding FERC's determination that Liberty's actions constituted a misuse of the municipal preference. Liberty further states that, "as a matter of absolutes," the remedy chosen by FERC restores Continental to the position it would have occupied absent the advantage Liberty initially gained. Liberty contends here, however, as it did in its petition to FERC for rehearing, that the Commission's remedy ignored the equities favoring Liberty, the thrust of Commission precedent, and the purposes of the Federal Power Act. We are satisfied that Liberty's arguments do not warrant a court order disturbing the Commission's judgment.

■ As the Commission's 1990 order stressed, the sanction applied to Liberty— license application dismissal and a one year

---

7. Notwithstanding the Commission's remedial order, Malta filed its own "preliminary permit application," asking that its ten-year delay be excused. FERC rebuffed Malta's plea. *See* 54 FERC ¶ 61,057 (1991).

bar to a renewed application—is identical to the sanction FERC previously imposed for similar instances of municipal abuse. Both the Commission's 1983 *Uncompahgre I* decision and its order in *Orofino Falls Hydro Ltd. Partnership,* 27 FERC ¶ 61,434 (1984), involved conduct not genuinely distinguishable from the surrender/new filing synchronization Liberty attempted here. Neither Liberty's relative candor in prosecuting its preference application nor its asserted reliance on the advice of Commission staff, FERC appropriately concluded, mandated more lenient treatment for Liberty. *See Orofino Falls* (holding that applicant's professed good faith is irrelevant to preference abuse determination); *cf.* 18 C.F.R. § 4.32(h) (FERC is not bound by opinions or advice of staff). Inherent in FERC's role as supervisor of competition for hydroelectric power licenses is authority to ensure that would-be misusers are deterred and that parties not be permitted to profit from their own, even innocently or benignly conceived, misuse of the licensing process.

■ We find similarly unpersuasive Liberty's claims that the Commission's redress order is impermissibly "retroactive" and that FERC erred in failing to read *Uncompahgre I* and its progeny in light of other cases, *e.g., City of Vidalia,* 31 FERC ¶ 61,237 (1985) (*Vidalia II*), and *Paterson Mun. Util. Auth.,* 27 FERC ¶ 61,323 (1984), where the Commission allowed room for private participation in projects that had been accorded municipal preference. As regards "retroactivity," it is true that the specific *Uncompahgre* remedy was not formulated until after Liberty's abuse occurred. Both the *Fayetteville* decision and the Director of Hydropower Licensing's 1981 order in this case, however, gave ample notice that conduct of the sort engaged in by Liberty would be checked; left open when Liberty acted was only FERC's determination, later made within the zone of reasonableness, of the precise terms of the sanction.

Liberty's argument that *Vidalia II* or *Paterson* should have controlled here is equally unavailing: in those cases, FERC allowed municipal *licensees* to accept limited assistance from private entities when the cities' financial situations had deteriorated unexpectedly. The surrender permit/file license application device before us presents a situation unlike those in *Vidalia II* and *Paterson,* and FERC legitimately exercised its discretion differently.

■ Liberty's most compelling argument is that FERC took far too long to resolve the abuse question and settle on a remedy. FERC's response in *Uncompahgre,* Liberty notes, was reasonably prompt. In contrast, five years passed between the 1982 synchronized surrender/new filing and the Commission's (preliminary) finding of abuse here. All information relied upon in the 1987 preliminary decision and the definitive 1990 order, Liberty points out, was known to the Commission in 1982. Several times in the years following 1982, the Commission had requested information concerning Liberty's license application, without questioning its basic qualification. Correspondingly, in those years, Liberty devoted considerable resources to license-related activity.

Certainly, the lengthy and unexplained delay Liberty experienced was, in FERC's own words, "regrettable." Just as surely, Liberty would have been better off had the Commission resolved the preference abuse issue with dispatch. On the other hand, as the Commission observed, Liberty knew from very early on that it risked disqualification. · Yet Liberty never petitioned the Commission, as did two of its rivals, for expedited proceedings or for a quick resolution of the preference abuse charges. Given respectable arguments for both sides on this point, we find insufficient cause to order the Commission to sanction Liberty's abuse less stringently.

## B. Malta

With Liberty effectively out of the contest, the Commission faced a choice that would leave one of the still-interested "innocent" competitors, Continental or Malta,

dissatisfied.[8] Malta contends that in reviving Continental's permit application, FERC acted both arbitrarily and outside the bounds of its statutory authority. We turn first to Malta's threshold, lack-of-authority argument.

■ Malta initially urges that the reinstatement of Continental was impermissible: FERC's authority under the FPA, Malta maintains, does not include the power to vacate an order (the 1981 dismissal of Continental's permit application) which, by its own terms, had become "final" and unappealable. Malta's lack-of-statutory-authority argument appears to be newly discovered. We note particularly that Malta interposed no objection of this character in a petition specifically asking the Commission to reconsider the Continental permit application reinstatement.

Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l* (b), expressly limits judicial review of Commission action to "objections [made] in ... [an] application for [Commission] rehearing," except when the petitioner points to a "reasonable ground" for failing to home in on the objection before the Commission. Malta not only failed to raise the objection in seeking Commission rehearing; it never made the argument before the Commission at all, and it has shown no "reasonable ground" for the omission. We are therefore not at liberty to take up the tardy challenge. *See Town of Norwood v. FERC*, 906 F.2d 772, 774–75 (D.C.Cir.1990); *ASARCO, Inc. v. FERC*, 777 F.2d 764, 773–74 (D.C.Cir.1985). Nor can Malta succeed in interjecting the issue now by mislabeling it "jurisdictional." We find it odd, in this regard, that a petitioner seeking "equity" should overlook the authority of a tribunal to grant relief from a final order when the equities so compel. *Cf.* FED.R.CIV.P. 60(b)(6); 11 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2864, at 211 (1973) (on relief from final judgments in federal courts on equitable grounds).

■ We proceed finally to this question: Did FERC's remedial order misjudge the relative equities of Tiber Dam development contenders Continental and Malta so seriously as to warrant the characterization arbitrary or capricious Commission action? Malta's burden on this issue is onerous, for "agency discretion," we have several times said, "is ... at [its] zenith" when the agency fashions remedies to effectuate the charge entrusted to it by Congress. *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C.Cir.1984) (quoting *Niagara Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C.Cir.1967)).

Malta emphasizes its reliance on the apparent "abandonment" by Continental of its Tiber Dam proposal and on Malta's own subsequent—and relatively diligent—pursuit of a license. Continental "sat on its rights," Malta asserts, by neither appealing from the dismissal of its permit application nor filing at the license stage. Malta contrasts with Continental's nonaction its own commitment of substantial resources to developing a viable plan for the hydroelectric project.

The Commission's action becomes still less defensible, Malta maintains, in the light of FERC's decisions in the concededly analogous *Uncompahgre* line of cases and of the Commission's stated preferences both for municipalities, and for (refined) license applications over (barely sketched) permit applications. *See* 18 C.F.R. § 4.37(a). FERC would have better fulfilled its mandate, Malta concludes, had it followed the *Uncompahgre* remedial course by starting the contest afresh and awarding the power license to the proposal that proved, under governing Commission policy, best qualified. *See, e.g., Gregory Wilcox*, 27 FERC ¶ 61,403 (1984) (*Uncompahgre III*) (upholding decision to initiate new contest over objection of original first-filing permit applicant).

We recognize that the equities favoring Malta's position are substantial. Furthermore, like Liberty, Malta would have been

**8.** The hands of non-petitioner Central Montana were similarly clean, but its status as the second-to-file nonmunicipal applicant indicated that its chances of winning, under whichever remedial approach FERC ultimately adopted, were not large.

better served had FERC responded to the preference abuse allegations at a less tardigrade pace. We conclude, nevertheless, that the Commission's resolution was reasonable. As FERC noted, Malta's failure to join the competition until the licensing stage contributed significantly to Malta's current predicament: absent the unjustified boost Liberty gained, Continental would likely have prevailed at the permit stage, leaving Continental well-positioned to deploy the permit-based preference to obtain a license. Because Continental was the party most immediately injured by Liberty's undeserved advantage, Continental's situation properly attracted strong consideration in FERC's equitable balance.[9]

FERC did not overlook the counterweights. Confronting Malta's charge that Continental had "slept on its rights," FERC observed that Continental raised the municipal preference abuse issue at the outset in 1981, and intervened in the licensing proceedings, requesting, as early as 1983, the very relief ultimately granted. Continental should not be set back, FERC determined, for failing to take an appeal—certain to be futile—from the dismissal of its permit application, nor for merely intervening at the licensing stage, taking into account that Liberty then remained the Commission-decreed front runner.[10] FERC also considered Malta's alleged detrimental reliance, but noted that Malta's license application expenditures had been undertaken with full awareness of the unresolved municipal preference issue, and the uncertainty that issue engendered. The sums invested by Malta, moreover, were comparable in magnitude to amounts commonly spent by defeated license applicants.

Turning to *Uncompahgre* and other cases prescribing a fresh competition, FERC acknowledged the force of the analogy, but found that, in this case, the timing of the abuse provided a crucial distinction.

FERC's disposition, we conclude, was not inconsistent with Commission precedent. In *Uncompahgre* itself, while the Commission declined to favor the first-to-file applicant, it explained that there was "no overriding equitable basis to prefer applicants who actually filed competing applications previously over those who were understandably discouraged from doing so due to the presence of a municipal competitor." *Uncompahgre II*, 26 FERC ¶ 61,113 at 61,-277. Here, FERC reasonably decided that others were not "chilled" before the permit application deadline, *see supra* p. 63, so that Continental was the party most immediately and adversely affected by the priority Liberty achieved.

As a court of review, we reiterate in conclusion, we are particularly deferential to the Commission when it exercises its equitable remedial discretion. In the matter at hand, FERC has restated its commitment to effective hydropower development, preferably by municipalities. But it has decided that these general policies must yield to its responsibility for maintaining the integrity of the licensing competition and for providing relief to parties harmed by attempts to subvert, undermine or avoid that process. On this record, we find the Commission's judgment reasonable, and therefore do not interfere with it.

### III. Conclusion

For the reasons stated, the petitions for review are denied, and the Commission's orders are

*Affirmed.*

---

**9.** FERC was careful to emphasize that relief for Continental was a matter of Commission discretion, rather than a requirement of Due Process. *See* 50 FERC at 61,314 n. 47.

**10.** Confusion and uncertainty might have been avoided in this case, and could be reduced in the future, if FERC furnished potential power project applicants with a clear statement of the necessary or appropriate procedural course, within the Commission, for a party claiming injury from a municipal preference abuse at the permit stage.