ASSOCIATED GAS DISTRIBUTORS,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Texas Eastern Transmission
Corporation, Intervenor.

No. 82–1758.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 22, 1983.

Decided May 13, 1983.

Joseph M. Oliver, Jr., Savannah, Ga., for petitioner; Frederick Moring, Jennifer N. Waters and Rochelle M. Gunner, Washington, D.C., were on the brief.

Joanne Leveque, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent. Jerome M. Feit, Sol., and Robert F. Shapiro, Atty., F.E.R.C., Washington, D.C., entered appearances for respondent.

Platt Walker Davis, III, Washington, D.C., for intervenor; Jack E. Earnest, Cheryl M. Foley, J. Evans Attwell, Judy M. Johnson and J. Craig Youngblood, Houston, Tex., were on the brief.

Before MIKVA and EDWARDS, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

The petitioner in this case, Associated Gas Distributors (AGD), intervened in a purchased gas adjustment (PGA) proceeding before respondent, the Federal Energy Regulatory Commission (FERC or Commission), brought by Texas Eastern Transmission Corporation (Texas Eastern), a major interstate natural gas pipeline company. AGD contends that as a customer of Texas Eastern it has a statutory right to examine

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

the contracts between Texas Eastern and its producer-suppliers on which Texas Eastern bases its request for a PGA rate increase, even though there is no legal requirement that such contracts be filed with the Commission. Alternatively, AGD argues that, even if it has no statutory right to examine the contracts in a PGA proceeding, the Commission abused its discretion in denying AGD's request to examine the contracts in this case. The Commission denied AGD's request, ruling that, absent specific allegations of fraud or abuse, a PGA proceeding is not the appropriate forum for inspection and review of these contracts. Because AGD is entitled to challenge these rates and to obtain any refunds due in different proceedings and because AGD failed to allege any specific wrongdoing, we uphold the Commission's decision to deny AGD's request.

BACKGROUND

### A. The Statutes

The sale and transportation of natural gas in interstate commerce is regulated by the Commission under two statutes, the Natural Gas Act of 1938 (NGA), 15 U.S.C. §§ 717–717w (1976 & Supp. V 1981), and the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301–3432 (Supp. V 1981). Under the NGA, the setting of rates and charges is governed by section 4, which provides, inter alia, that all rates charged by either a pipeline or a producer must be just and reasonable, that the rates must receive prior approval from the Commission, that the burden of proof rests with the pipeline or producer, and that all contracts relating to these rates must be filed with the Commission. 15 U.S.C. § 717c(c), (d) (1976). The section further directs that whenever a pipeline or a producer requests a rate change the Commission may, either on its own initiative or following a complaint, hold a hearing to determine the lawfulness of that rate change. 15 U.S.C. § 717c(e).

In 1978 Congress substantially altered these requirements with the enactment of the NGPA. Section 601 of that Act states that the prices a pipeline must pay for certain specified types of gas (dubbed in the literature as "new gas") are no longer subject to regulation under section 4 of the NGA. 15 U.S.C. § 3431(a)(1). The section states that the prices are deemed to be just and reasonable if they do not exceed the congressionally-mandated maximum lawful price or if the gas has been deregulated. 15 U.S.C. § 3431(b)(1)(A). Consequently, it is no longer necessary that these prices receive prior approval or that the contracts on which they are based be filed with the Commission. The rates at which a pipeline sells its gas are still subject to section 4, but the pipeline is entitled to pass through the prices at which it bought the gas unless "the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. 3431(c)(2).

### B. The PGA Proceeding

In the early 1970's, long before the passage of the NGPA, it became apparent that the lengthy and complicated procedures of full-scale section 4 review were not the most efficient method of handling the growing volume of rate increase filings. Accordingly, in 1972, the Commission created a streamlined alternative—the PGA proceeding—which allows a pipeline to facilitate recovery of costs by including a purchased gas cost adjustment clause in the rates it files with the Commission. See 18 C.F.R. § 154.38(d)(4) (1982). The stated purpose of this time-saving proceeding was to prevent rate increase filings from becoming "pancaked," i.e., piled up on top of one another such that new ones were filed before the old ones were approved. 47 F.P.C. 1049, 1050 (1972). As established by the Commission, this procedure is optional and its use must receive prior approval. To obtain a PGA rate increase, a pipeline must file a report focusing on the purchased gas component of the pipeline's costs and detailing each pipeline purchase by contract, contract date, projected volume, rates to be paid, and total cost of the purchased gas under the contract for the period encom-

passed by the filing. 18 C.F.R. § 154.-38(d)(4)(v) (1982). In exchange for this expedition of the rate increase process, moreover, a pipeline must agree to submit all of its costs and revenues to full review under section 4 at least once every three years. *Id.* § 154.38(d)(4)(vi) (1982).

Because the PGA procedure is conducted pursuant to the Commission's power under section 4, the customers of a pipeline are entitled to file a complaint concerning the lawfulness of the pipeline's PGA rate increase. Since the enactment of the NGPA and its provision for the pass-through of the producer's prices, however, the scope of that complaint is limited, assuming the producer's prices are within the mandated limits, to a determination whether the amount paid by the pipeline to the producer is excessive due to fraud or abuse. The NGPA further limited the efficacy of a section 4 complaint by reducing the information available to a complainant. Prior to 1978 a customer could easily verify whether the cost of the "new gas" reported by the pipeline in its PGA filing corresponded with the underlying contracts because they were routinely filed with the Commission. Since 1978, however, this verification has been made more difficult because the underlying contracts no longer need to be filed.

## C. The Facts

On July 2, 1981 Texas Eastern filed a PGA rate increase with the Commission pursuant to section 4 of the NGA and 18 C.F.R. § 154.38(d)(4). The proposed rate was to go into effect on August 1, 1981 for six months and was to increase charges to Texas Eastern's customers by $312 million. The Commission issued a notice of proposed changes in tariffs on July 10 and undertook its review of the filing. Twelve days later, AGD sought leave to intervene on the ground that many of its member companies were customers of Texas Eastern. The gist of AGD's claim was that the underlying contracts should be scrutinized with care because the contractual authority for the proposed PGA rates might not exist. Accordingly, AGD requested that the Commis-

sion direct Texas Eastern to furnish those contracts relevant to its PGA filing by identifying the applicable contracts pertaining to "old gas" that were already on file and providing copies of those contracts pertaining to "new gas" that were not.

On July 31, 1981 the Commission granted AGD's petition to intervene but deferred decision on the data request. It accepted Texas Eastern's rates, suspended them for one day, and ordered a hearing on the prudence of four emergency purchases Texas Eastern had made. On September 8, at Texas Eastern's request, the Commission postponed the hearing and denied the date request, stating:

> [E]xcept for those contracts relating to the emergency purchases which are the subject of this hearing, the contractual information requested by AGD is not relevant and material to an issue in this proceeding . . . .

Joint Appendix (JA) 148. AGD applied for rehearing and moved in the alternative to broaden the scope of FERC's proceedings to encompass the contractual authority question. The alternative motion only asked for discovery, however, and the application was denied on May 19, 1982. The Commission stated that Texas Eastern was not required to identify the specific contracts on file and that the PGA filing already contained sufficient information. With regard to AGD's access to the non-filed contracts, which is the main issue in this case, the Commission stated:

> AGD expresses concern about the contractual authority of Texas Eastern's producer-supplier to charge the rates they have charged. But the concern is very general and does not rise to the level of a specific protest and an immediate request for a hearing on the matter. The hearing request is postponed by AGD to some future, unspecified time after AGD has completed its "audit" of Texas Eastern's producer-supplier contracts. As we noted previously, our review of the filing indicated that only the emergency purchase issue should be set for hearing. We did not find, in our review, that there were

any other questions concerning the appropriate gas purchase prices included in the filing which should be set for hearing. Nor has AGD raised any specific questions which would lead us to reverse our previous decision and to expand the scope of the hearing. Therefore, their request for expansion of the hearing is denied. Absent such expansion, the discovery requested is clearly outside the scope of the hearing and, accordingly, it is denied. JA 174. The denial of AGD's application led to this petition for review.

### DISCUSSION

#### A. *The Statutory Right*

■ AGD first argues that it is entitled, as a matter of statutory right, to examine the contracts underlying Texas Eastern's PGA filing. AGD does not rely on a literal reading of the statutes in making this argument because the NGPA eliminated the requirement of filing contracts between a producer and a pipeline. Rather, it argues that the statute, by giving customers a right to complain, necessarily implies a right to examine contracts. AGD's argument proceeds in the following manner. Because the NGPA does not remove pipeline rates from the Commission's jurisdiction under section 4, those rates must still receive prior approval and are subject to complaint by a customer under 15 U.S.C. § 717c(e). Although the NGPA allows a pipeline to pass through the producer's prices as costs, a pipeline may only do so if the amount it pays the producer is not "excessive due to fraud, abuse, or similar grounds," 15 U.S.C. § 3431(c)(2). The only way to establish whether the amount paid is excessive is to compare what the pipeline paid with the price set forth in the contract. Therefore, AGD concludes, if the customer's right to complain is to have any meaning, it must include the right to examine the underlying contracts.

This reasoning is, at first glance, quite appealing, as the pipeline customers are placed in what appears to be a "Catch-22" situation. They can only challenge a pipeline's rates if the rates reflect excessive costs; they can only tell whether the costs are excessive by looking at the underlying contracts; and yet, according to the Commission, they can examine the underlying contracts only if they have some evidence that the passed-through costs are excessive. If fraud has indeed occurred, this evidence will, in all likelihood, not be evident from the PGA filing. Nor, unless the fraud only occurs with regard to the contracts pertaining to "old gas," will this evidence always be in the Commission's files.

AGD's reasoning ignores the fact, however, that, as a condition for using the PGA procedure, a pipeline must agree to submit its costs and revenues to a full section 4 review at least once every three years, *see* 18 C.F.R. § 154.38(d)(4)(iv), at which time the underlying contracts, if requested, can be made available and refunds, if necessary, can be made. The full section 4 review is much broader in scope than a PGA proceeding, and, as the Commission itself has stated, the parties are afforded "a wide[r] degree of latitude of discovery in section[ ] 4 ... general rate proceeding than in the mechanized and expedited PGA proceedings." *Tennessee Gas Pipeline Company,* 21 F.E.R.C. ¶ 61,004 n. 24 (1982). During this full section 4 review it is quite likely that if the question of contractual authority is raised the Commission will require that the underlying contracts be produced. Indeed, in the currently pending full section 4 review involving Texas Eastern, AGD has intervened and the underlying contracts at issue in this case have been made available subject to a protective order. *See Texas Eastern Transmission Co.,* FERC Docket No. RP 81–109, 16 F.E.R.C. ¶ 61,182 (1981).

If, during the full section 4 review, an examination of the contracts between the producers and Texas Eastern reveals that Texas Eastern has been paying and passing through more than is required by contract, Texas Eastern's customers, including AGD, have an adequate remedy. They may request that the Commission use its powers under 18 C.F.R. § 154.38(d)(4)(vi)(c) to order Texas Eastern to lower its rates and to refund all excess amounts collected since

the last full section 4 review. If for some reason the Commission is not itself empowered to order a refund, it is empowered to sue in district court to force compliance with the NGPA. *See* 15 U.S.C. § 3414(b). If it is shown that excessive costs have been passed through, the district court is authorized by statute to order either a refund or restitution. *Id.* § 3414(b)(4). We are presented here, then, with a situation in which 1) a pipeline cannot use the PGA procedure without subjecting all of its costs and revenues to full review at least once every three years, 2) that full review encompasses all of the PGA proceedings during the relevant time period, 3) any legal or factual question relevant to those PGA proceedings is not mooted if it remains unanswered until the full review takes place, and 4) adequate relief remains available.

The Commission has interpreted the NGA and the NGPA to require that the underlying contracts be produced only when it determines that there is some evidence of fraud or abuse. If access to the contracts and the right to obtain a refund were unavailable in another proceeding, we would be forced to disagree with this reading. Here, however, AGD's statutory right to complain is fully effectuated in the full section 4 review. Thus, we hold that limiting the right to examine the underlying contracts to those instances in which some evidence of fraud or abuse is alleged is a permissible reading of the statutes.

## B. *The Commission's Discretion*

■ The question remains whether the Commission abused its discretion in denying AGD's data request. Given our holding on the statutory issue, the answer is plainly no. The statute mandates that the Commission accept for filing all rates "except to the extent [it] determines that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. § 3431(c)(2). The Commission has held hearings and examined the underlying contracts where fraud or abuse was alleged, but it has stated that

> [t]he mere conclusory allegation of a violation without any factual or indicative elements supporting such an allegation would ordinarily not be sufficient to lead the Commission to set the matter for hearing.

*Transcontinental Gas Pipe Line Corp.,* 14 FERC ¶ 61,204 (1981); *Columbia Gas Transmission Corp.,* 14 FERC ¶ 61,202 (1981). In these proceedings the Commission denied AGD's discovery request because AGD failed to allege any wrongdoing and merely claimed the right "to evaluate the contractual authority upon which [Texas Eastern] relies...." JA 118. We hold that in these circumstances the Commission did not abuse its discretion.

Accordingly, the petition of AGD is denied and the orders of the Commission denying the data request are

*Affirmed.*