**K N GAS SUPPLY SERVICES, INC., Plaintiff,**

v.

**AMERICAN PRODUCTION PARTNERSHIP–V, LTD., and Ninian Oil Finance Corp., Defendants.**

**Civil Action No. 95–B–291.**

United States District Court, D. Colorado.

Feb. 25, 1998.

Steve H. Ozawa, Denver, CO, Peter Pryor, Pryor, Johnson, Montoya, Carney and Karr, P.C., Englewood, CO, for Plaintiff.

Spencer Denison, William D. Watson, David S. Steefel, Holme Roberts & Owen, Denver, CO, William C. Slusser, Jennifer Smith, Drew Fossum, Baker & Botts, L.L.P., Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this diversity contract case, defendants American Production Partnership–V, LTD. and Ninian Oil Finance Corp. (collectively, American or defendants) move for summary judgment pursuant to Fed.R.Civ.P. 56 on the remaining claims of plaintiff, KN Gas Supply Services, Inc. (KNGSS). KNGSS seeks declaratory judgment as to its right to: 1) receive a refund under the contract's cost of service provision which has or will result in monetary losses to KNGSS; and 2) a reduction in the contract prices to levels which will not result in any monetary losses to KNGSS. After consideration of the motion, briefs, and arguments, and for the reasons set forth in this order, I will grant defendants' motion.

### I.

The following facts are undisputed or stipulated by the parties. This action is based upon a gas purchase contract dated January 1, 1992 (1992 Contract) among American and KN Energy, Inc. (KN). The 1992 Contract was entered into by American and KN pursuant to settlement of litigation regarding the parties' respective rights and obligations under a 1973 gas purchase contract. The 1992 Contract, executed on April 8, 1992, became effective, retroactively on January 1, 1992, for a term of 20 years. Def. Ex. 1, ¶ 17.1. Other than the effective date, the 1992 Contract contains virtually the same terms as the 1973 gas contract, including the contract price KN paid American for its gas, *id.* at ¶ 7.1(A), and an annual automatic 4% price increase for the term of the contract. *Id.* at ¶ 7.1(B). Although subject to market fluctuations, the 1992 Contract gas prices have been and remain in excess of the market level prices. The 1992 Contract provides for the sale by American and the purchase by KN of gas produced from American's undivided twenty-five percent of the interest formerly committed and covered by the 1973 contract.

### II.

*SUMMARY JUDGMENT STANDARD*

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to

judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III.

On July 31, 1991, the Federal Energy Regulatory Commission (FERC or the Commission) issued a "Notice of Proposed Rulemaking" (NOPR) which pre-saged in many, if not all, ways the contents of its April 8, 1992 Order No. 636, *Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol* (Order 636).

The focus of the dispute in this case is the Order 636 Series issued by FERC on April 8, 1992 (Order No. 636), August 3, 1992 (Order No. 636–A), November 27, 1992 (Order No. 636–B), and February 27, 1997 (Order No. 636–C) (collectively, the Order 636 Series). On April 8, 1992, the same day Order 636 was issued by FERC, KN and American executed the 1992 Contract, effective retroactively, January 1, 1992.

Under the terms of the 1992 Contract, KN agreed to purchase an annual minimum quantity of gas from American. Pursuant to § 7.1(B), the price was fixed for the period from July 1, 1992, to January 1, 1993, at $3.20 per MMBtu. On January 1, 1993, and each January thereafter for the term of the 1992 Contract, the price automatically increased by 4%. KN assigned the 1992 Contract to its subsidiary KNIT on October 1, 1993. KNIT assigned a percentage of its rights and obligations under the 1992 Contract to various of its wholesale customers which, in turn, assigned those rights and duties under the 1992 Contract to KNGSS. KNIT assigned the remainder of its rights and obligations under the 1992 Contract directly to KNGSS.

## IV.

American's summary judgment motion centers on the 1992 Contract § 7.7 which provides:

In the event the Federal Energy Regulatory Commission ("Commission") shall find as a result of a rate or certificate filing by Buyer, on the Commission's own motion, or in any other manner, that the price herein provided is unreasonably high considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales in the same producing area, or if the Commission in any rate filing by Buyer shall disallow a portion of the price herein provided as not being a reasonable part of Buyer's cost-of-service, effective with the date of such finding or disallowance the price to be paid for gas hereunder shall be reduced by that portion of the price herein provided which is thus found by the Commission to be unreasonably high or which is thus disallowed as a part of Buyer's cost-of-service.

(Def.Ex. 1 p. 12).

American seeks summary judgment on KNGSS' remaining claims 1, 2, and 3, on the following grounds:

1) section 7.7 is not applicable to KNGSS, as KN's assignee of the 1992 Contract because § 7.7 was not assignable; alternatively,

2) if § 7.7 is assignable it is unambiguous and the Order 636 Series do not render § 7.7 ambiguous;

3) section 7.7 was not triggered by either a FERC finding of unreasonable contract price or disallowance; and

4) KNGSS' actions after the Order 636 Series issued were inconsistent with its assertion that § 7.7 was triggered by Order 636;

KNGSS opposes American's motion for summary judgment for the following reasons:

1) KN's assignment of the contract to KNGSS was valid;

2) although unambiguous on its face, § 7.7 is rendered ambiguous in the context of "changed regulatory circumstances" as a result of the Order 636 Series;

3) if § 7.7 is not rendered ambiguous by the Order 636 Series, the issuance of the Order 636 Series triggered the first clause of § 7.7;

4) if § 7.7 is not rendered ambiguous by the Order 636 Series, FERC's implementation of the Order 636 Series triggered the second clause of § 7.7; and

5) KN's and KNGSS' actions have not been inconsistent with KNGSS' claims in this action.

### A. Validity of Contract Assignment from KN to KNGSS

American argues that the 1992 Contract § 7.7 does not apply because it is non-assignable. I disagree.

The 1992 Contract contains the following provision under the heading "Miscellaneous:"

> 20.2 *Assignment.* This Contract and each of its covenants and obligations shall inure to the benefit of and be binding upon the parties hereto and upon their respective successors and assigns; provided, however, that Buyer shall not be bound by any transfer by Seller or any interest in the leases covered hereunder until Buyer has been furnished with the original or certified copy of such transfer and suitable evidence of transferee's interest.

Def.Mtn. Ex..1 p. 23 (emphasis in original).

Under Colorado law, which the parties agree applies, parties may agree to make an otherwise unassignable contract assignable by insertion of a "successors and assigns" provision. *Baum v. Rock,* 106 Colo. 567, 575, 108 P.2d 230, 234 (1940). American cites *Temple Hoyne Buell Foundation v. Holland & Hart,* 851 P.2d 192 (Colo.App.1992) for the proposition that assignments are valid only if such assignment would not impair the rights of the parties to the contract. *Id.* at 198. The *Buell* court, however, did not consider assignability in the context of a "successor and assigns" contract provision or *Baum.* Under the plain language of the 1992 Contract § 20.2, either party could assign the contract. Accordingly, § 7.7 was assignable and is applicable in this case.

### B. Ambiguity of § 7.7

American contends that § 7.7 is unambiguous and should be analyzed accordingly. KNGSS concedes that § 7.7 is unambiguous as written but argues that it was rendered ambiguous by the Order 636 Series.

Whether this contract provision is ambiguous is analyzed under Colorado law. *See McNickle v. Bankers Life and Cas. Co.,* 888 F.2d 678, 680 (10th Cir.1989). KNGSS argues, however, that even if § 7.7 is clear on its face or unambiguous under Colorado law, it is rendered ambiguous when viewed in context of the Order 636 Series.

The Commission issued the Order 636 Series in 1992, 1993, and 1997 implementing FERC's latest step in a 10 year restructuring of the natural gas industry from direct regulation of certain aspects of the industry to a "light-handed" regulatory policy. *United Distribution Cos. v. FERC,* 88 F.3d 1105, 1123 (D.C.Cir.1996)(UDC). Historical review of the natural gas industry reflects that the Order 636 Series did not render ambiguous § 7.7.

### 1. Natural Gas Industry History

The natural gas industry is separated functionally into production, transportation, and distribution. *UDC,* 88 F.3d at 1120. Traditionally, a gas producer extracted the gas and sold it at the well head to a pipeline company which transported the gas through its pipelines. The pipeline company resold the gas to local distribution companies which in turn distributed the gas to their industrial and residential customers. *Id.; see also* Edward C. Gallick, *Competition in the Natural Gas Industry* 9–12 (1993).

### a. The Natural Gas Act of 1938

In 1938, Congress enacted the Natural Gas Act (NGA), ch.556, 52 Stat. 821 (codified, as amended, at 15 U.S.C. §§ 717–717w) thus initiating federal regulation of the natural gas industry. The NGA was written with the overriding purpose " 'to protect consumers against exploitation at the hands of natural gas companies.' " *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 631, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972)(quoting *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)). Based on the NGA's purpose, federal regulation of the natural gas industry is fashioned to check pipeline companies' monopoly power over gas transportation. *Id.*

The NGA gave the Federal Power Commission (FPC or the Commission) and its successor, FERC, jurisdiction over sales for resale in interstate commerce and the interstate transportation of gas. The regulation of local distribution was left to the states. *Id.* For many years, the Commission also regulated the price and terms of sales contracts between gas producers and interstate pipelines (producer contracts). *See Phillips*

*Petroleum Co. v. State of Wisconsin,* 347 U.S. 672, 677–84, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

### b. *Natural Gas Policy Act of 1978*

In response to the severe national gas shortage in the early 1970's, Congress enacted the Natural Gas Policy Act of 1978 (NGPA), Pub.L. No. 95–621, 92 Stat. 3352 (codified as amended at 15 U.S.C. §§ 3301–3432(1994)) which, over time, phased out producer price regulation as contemplated by the NGA. With the move towards price deregulation contained in the NGPA, Congress altered considerably some of the rate approval requirements of the NGA.

### i. *Rates and Charges*

Under the NGA, the setting of rates and charges is governed by § 4 which provides, *inter alia,* that all rates charged by either a pipeline or a producer must be just and reasonable, the rates must receive prior approval from the Commission, and all contracts relating to these rates must be filed with the Commission. 15 U.S.C. § 717c(c), (d)(1976).

The NGPA, § 601 provided that prices of certain types of gas were no longer subject to regulation under § 4 of the NGA. 15 U.S.C. § 3431(b)(1)(A). Rather, gas prices were deemed to meet the NGA "just and reasonable" standard if they did not exceed the congressionally mandated maximum lawful price or if the gas had been deregulated. § 3431(b)(1)(A). Consequently, it was no longer necessary that these prices receive *prior* approval of the Commission. *Associated Gas Distributors v. FERC,* 706 F.2d 344, 345 (D.C.Cir.1983).

During the 1970's and 1980's, many pipelines, including KN, entered into long-term, minimum purchase requirement contracts to purchase gas from producers at prices which, over time, were and continue to be well above current gas market prices. Richard J. Pierce, Jr. *Reconstituting the Natural Gas Industry from Wellhead to Burnertip,* 9 Energy L.J. 1, 11–16 (1988). These producer contracts incorporated high prices and provisions for upward escalation of prices, which resulted in contract prices well over market price. Also, the pipelines, including KN, commonly agreed to inclusion of a "take-or-pay" provision which obligated the pipelines

either to purchase a specified percentage of the producer's deliverable gas or to make "prepayments" for the quantity of gas whether or not the pipeline took delivery of the gas. *Associated Gas Distributors v. FERC,* 824 F.2d 981, 1021 (D.C.Cir.1987); *see* Def. Ex.. ¶ 4.3(A). While usually "subject to recoupment later, ... the take-or-pay provisions effectively committed the pipelines to high gas costs in what by 1982 proved to be a time of falling prices...." *Id.* at 996.

During this period, the gas supply and demand problems coupled with volatile gas prices ultimately gave rise to two mechanisms designed and implemented by the Commission to allow natural gas pipelines to recover their costs. The purchased gas adjustment (PGA) procedure and FERC Order No. 500 were fashioned to address the distinct problem of take-or-pay contract clauses. *Williams Natural Gas Co. v. FERC,* 3 F.3d 1544, 1545 (D.C.Cir.1993).

### ii. *Purchased Gas Adjustment Mechanism*

As the price of natural gas escalated rapidly in the early 1970's, the Commission was deluged with multiple rate increase filings from interstate pipeline companies seeking to insure recovery of their purchased gas costs under the NGA's § 4 requirement that rate changes must receive prior approval from the Commission. In response, the Commission created a "streamlined" mechanism known as the PGA. 47 F.P.C. 1049, 1050 (1972).

The PGA proceeding allowed a pipeline to facilitate recovery of gas costs to them by including a purchased gas cost adjustment clause in the rates it filed with the Commission. *See* 18 C.F.R. § 154.38(d)(4)(1982). *AGD,* 706 F.2d at 345. To obtain a PGA rate increase, a pipeline filed a report detailing each contract purchase, projected volume, rates to be paid, and total purchased gas costs under the contract for the covered period. 18 C.F.R. § 154.38(d)(4)(v)(1982). In exchange for the expedited rate increase process, the pipeline submitted all of its costs and revenues to full review under NGA § 4 at least once every three years. *Id.* at § 154.38(d)(4)(vi)(1982). Simply put, the PGA permitted natural gas pipelines to adjust their rates periodically, without prior Commission approval, to reflect changes in

the price of purchased gas. *See* 18 C.F.R. § 154.301–.310; *Panhandle Eastern Pipe Line Co. v. FERC,* 777 F.2d 739, 742 (D.C.Cir.1985). The PGA rules required a pipeline company to bill its customers for predicted gas cost for an upcoming period and to charge or refund, by means of "surcharge adjustments," the difference between its actual costs and previously projected costs. *Id.*

The rates at which a pipeline sold its gas remained subject to NGA § 4, but the pipeline was entitled to "pass through" the prices at which the pipeline bought the gas unless "the Commission determine[d] that the amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. § 3431(c)(2); *AGD,* 706 F.2d at 345. While remaining under the purview of NGA § 4, the PGA did not involve the cumbersome data production and procedural requirements of a formal § 4 proceedings. *Philadelphia Gas Works v. FERC,* 989 F.2d 1246 1248 (D.C.Cir.1993). In approving a pipeline's rates, however, the FPC, and later the FERC, reviewed the pipeline's purchased gas costs and could disallow all or any portion thereof. *Id.*

### iii. *Evolution of Order 500 take-or-pay costs recovery mechanism*

#### (a) *Order 436*

The pipelines faced the separate but related problem of long-term above market price producer contracts containing take-or-pay provisions. Commonly, the problem posed by these contracts is referred to as the take-or-pay issue. More specifically, however, it is the combination of "supra-market" prices (contract price over market price) and take-or-pay clauses which created the problems faced by the gas industry.

In 1983, it was predicted that as a result of high prices and take-or-pay liabilities, pipeline liabilities would reach $7 billion. *Associated Gas Distributors,* 824 F.2d at 1021. (cites omitted). The possibility that consumers would be saddled with the pipelines' potential losses loomed large. Consequently, the stage was set, for the first time, for the Commission to adopt rules enabling customers to buy gas at the wellhead and to overcome the pipelines' general refusal to transport gas that competed with their own sales.

*Id.* Besides protecting consumers from the burden of the pipelines' producer contracts at supra-market prices, such rules would have the long-term effect of subjecting pipelines to the customary constraints of a middleman under competitive conditions. *Id.*

With these goals in mind, in 1985, the Commission issued Order No. 436, 47 F.R. ¶ 30,665 at p. 31,467, which, for the first time, provided pipeline customers with open-access to gas transportation. Order 436 was aimed at removing pipelines from the gas sales business and confining them to a more limited role as gas transporters. *UDC* at 1123.

As contemplated by the Commission, one effect of Order 436 was the imposition of the common carrier duties upon interstate pipelines. *Id.* at 1123–24. "By recognizing that anti-competitive conditions in the industry arose from pipeline control over access to transportation capacity, the equal-access requirements of Order No. 436 regulated the natural-monopoly conditions directly." *Id.* at 1124.

The Commission declined to include in Order 436 any special provision to relieve pipelines from the burden of producer contracts containing take-or-pay provisions at prices well above current gas prices. *Associated Gas Distributors,* 824 F.2d at 996. Rather, the Commission reaffirmed a previous policy statement that deferred the take-or-pay issue to individual rate-case filings. Order No. 436, 47 F.R. ¶ 30,665, at pp. 31,560–69.

Upon review, the D.C. Circuit Court of Appeals largely approved Order 436. However, the Court remanded the case to the Commission to address the unresolved problem of uneconomical producer-pipeline contracts in light of Order 436. *Id.* In Order 436, the Commission assumed that under competitive pressures, a pipeline would "seek to adjust its gas purchasing practices so as to lower its ... cost of gas to all customers." *Id.* at 1024. (citations omitted). The D.C. Circuit Court of Appeals was concerned that the Commission was "assum[ing] away the problem of the uneconomical contracts to which pipelines are presently bound" as well as appearing to "confuse the pipelines' incentives to renegotiate contracts with their ability to do so." *Id.* Order 436 put pressure on

pipelines to allow shipments of gas in competition with their own supplies, thus increasing their difficulties in selling, without loss, quantities of gas that they were obliged to take or pay for. *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 573 (D.C.Cir.1990).

Pertinent to this case, in Order 436, the Commission refused to modify producer-pipeline contracts noting that such action would "raise extremely serious questions regarding the ability of private parties in the gas production industry to rely on private contracts as a tool for structuring basic economic relationships." 47 F.R. ¶ 30,665, pp. 31,492–93. The Commission "declined to pursue this path," *id.*, stating that "*nowhere* in the final rules has the Commission abrogated any contracts nor created a regulatory framework predicated on any unilateral contract abrogation." *Id.* (emphasis in original).

(b). *Order 500*

In response to the remand of Order 436, the Commission issued Order No. 500 in which the Commission dealt with the difficulties arising from the take-or-pay contract provisions by shifting some of these costs onto producers and customers. *See* Order No. 500, 52 F.R. ¶ 30,334 (1987). The Commission adopted two alternative cost-recovery mechanisms by which a pipeline could recover some, if not all, of its take-or-pay costs. The pipelines could recover all of its prudently incurred costs in its sales charges to customers, as had been the industry custom. In the alternative, the Commission adopted an "equitable-sharing" approach whereby a pipeline could, if it voluntarily absorbed between 25% and 50% of the costs, recover an equal share of the costs through a "fixed charge" to the sales customer. The pipeline could recover the remaining amount (up to 50%) through a volume based surcharge borne by both sales and transportation customers alike. *See UDC* at 1124. *See also K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1299–1300 (D.C.Cir.1992)(court upheld Commission's reading of its regulation that commodity rate surcharge must also be based on total volume throughput). The Commission also authorized pipelines not recovering take-or-pay costs in any other manner to impose a fixed gas inventory charge, akin to a reservation charge, for "standing ready" to deliver gas. Order No. 500, F.R.

¶ 30,761, at 30,792–94; 18 C.F.R. § 2.105; *see also UDC* at 1124. Significantly, none of the options chosen by the Commission involved modifying the producer-pipeline contracts.

The Commission's Order No. 500 solutions to the take-or-pay provisions did not fare well on judicial review. The D.C. Circuit Court struck down Order 500's equitable-sharing cost-recovery mechanism. *Associated Gas Distributors v. FERC*, 893 F.2d 349, 354–57 (D.C.Cir.1989)(AGD II)(mechanism unacceptable based on past gas usage). In response, the Commission adopted Order No. 528 allowing pipelines to pass through a portion of gas costs by imposing the fixed gas inventory charge to customers based on current, rather than past usage. *UDC* at 1125. The D.C. Circuit also remanded a portion of Order 500, questioning the Commission's authority under NGA § 7 to implement the cost-recovery mechanism. *American Gas Ass'n v. FERC*, 888 F.2d 136, 148–49 (D.C.Cir.1989)(AGA I). *See also American Gas Ass'n v. FERC*, 912 F.2d 1496, 1509–13 (D.C.Cir.1990)(AGA II) (crediting mechanism upheld upon explanation of § 7 authority). The Commission terminated the crediting mechanism as of December 31, 1990. Order No. 500–K, FERC Stats. & Regs. (CCH) ¶ 30,917, *reh'g denied,* Order No. 500–L, 55 FERC ¶ 61,489 (1991).

After the legal fate of Orders 436 and 500 was decided, the producers were left, as before, with the PGA as the sole means to relieve problems engendered by the producer contracts' supra-market gas prices. The take-or-pay problems were addressed separately by Order No. 500's "equitable-sharing mechanism" as modified, so that pipelines could pass the take-or-pay buyout costs along to their customers, but only if the pipelines agreed to absorb between 25 and 50 percents of the costs. *Williams Natural Gas Co. v. FERC*, 3 F.3d 1544, 1545 (D.C.Cir.1993).

The distinction between the two cost-recovery mechanisms, the PGA mechanism versus the "equitable-sharing" mechanism, is emphasized by the fact that settlement payments relating solely to take-or-pay liabilities *must* be recovered under Order No. 500. *Regulatory Treatment of Payments Made in*

**1290**

*Lieu of Take–or–Pay Obligations,* 50 F.r. 16,076–77 (April 24, 1985)(declaring · that take-or-pay buyout payments do not qualify as type of "purchased gas costs" recoverable under PGA regulations). Consistent with the distinction between the PGA proceeding and Order 500, payments intended exclusively to settle disputes over the price of gas already taken, were eligible for PGA recovery. *See Columbia Gas Transmission Corp .,* 30 FERC ¶ 61,224, at 61,444 (1985).

### iv. *1989 Natural Gas Wellhead Decontrol Act*

The next major step in FERC's gradual deregulation of the natural gas industry occurred in 1989 when Congress completely deregulated the producer sales market based on the Commission's creation of open-access transportation. Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101–60, 103 Stat. 157 (codified in various sections of 15 U.S.C.). Pertinent to this case, the House Committee on Energy and Commerce commented that "[t]his legislation does not deregulate gas pipelines, and the Committee will continue its oversight of the FERC to ensure that captive residential consumers are not disadvantaged, and that the current competitive 'open access' pipeline system is maintained." H.R.Rep. No. 29, 101st Cong., 1st Sess. 4 (1989), U.S.Code Cong. & Admin.News 1989, p. 53.

### v. *Order No. 636 Series*

FERC's Order No. 636 Series, issued beginning in 1992, is the most recent step in the FERC's ten year restructuring of the natural · gas industry. In Order No. 636, FERC adjudged the open-access transportation requirements of Order 436 a partial success. However, FERC concluded that many customers had not taken advantage of Order 436's option of unbundling transportation services because the bundled transportation component of bundled sales service was "superior in quality" to stand-alone transportation service. 57 F.R. ¶ 30,402 quoting Order 436. Based on the anti-competitive effect on the industry, the Commission found that pipelines' bundled sales service violated NGA §§ 4(b) and 5(a). *Id.* at ¶ 30,405. The Commission's solution for these anti-competitive conditions was mandatory unbundling of pipelines' sales and transportation services. The Order 636 Series also provided the man-

ner and means by which the anti-competitive bundling would be dismantled.

After two comprehensive rehearing orders, Orders 636–A and B, the Commission denied further rehearing of Order 636. 62 F.R. ¶ 61,007 (1993). Predictably, numerous petitions for review of the Order 636 Series were filed in federal courts across the nation. The Judicial Panel on Multidistrict Litigation consolidated all of the petitions and transferred them, ultimately, to the D.C. Circuit Court of Appeals.

### vi. *United Distribution Companies v. FERC,* 88 F.3d 1105 *(D.C.Cir.1996)(UDC)*

*UDC,* the predominant judicial response to the Order 636 Series, is well-reasoned and thorough. Therefore, I adopt its relevant holdings.

As applicable here, the *UDC* Court dealt with challenges to the Commission's handling of transition costs incurred by pipelines as a result of mandatory unbundling. Order 636 required pipelines to unbundle their firm sales contracts into separate transportation and gas sales arrangements and permitted customers to reduce or eliminate their commitments to buy gas from pipelines. As a result, in many cases, the pipelines were forced by market pressures to buy their way out ·of many costly supply contracts with producers. These pipelines incurred an estimated $1.7 billion in gas supply realignment (GSR) costs. *UDC* at 1182. Order 636 authorized pipelines to recover 100% of their prudently incurred gas supply realignment costs from a certain category of transportation customers. *Id.*

The *UDC* pipeline petitioners argued that FERC should have used its NGA § 5 authority to require gas producers to bear part of the GSR costs. Once again raising the issue of the supra-market price contracts containing take-or-pay clauses, petitioners presented several alternative solutions to the transition cost problems, some of which would have required FERC to abrogate existing contractual obligations between pipelines and gas producers. *UDC* at 1184. In Order 636A, FERC declined to adopt these proposals because, *inter alia,* it lacked § 5 authority to abrogate producer-pipeline contracts. Order

No. 636–A, 57 F.R. ¶ 30,950, at 30,643. The *UDC* court stated that "[t]he Commission is correct that it lacks such authority." *Id.* Mindful that the Commission still retained jurisdiction over some "old" gas contracts when it issued Order 636, the *UDC* court also concluded that FERC "reasonably declined to exercise the limited authority it possessed over producer-pipeline contracts." *Id.* at 1182.

The petitioners also argued that the pipelines themselves should have been required to absorb some portion of their GSR costs. The Court stated that it was not holding that "the Commission was required to assign a particular portion of gas supply realignment costs to pipelines." Instead, the Court found the Commission's stated reasons for exempting the pipelines "d[id] not rise to the level of 'reasoned decisionmaking,' " *id.* at 1188, and remanded the question for "further consideration." *Id.* at 1182.

On remand, the Commission issued Order 636–C in which it reconsidered the rationale supporting the allocation of the GSR costs caused by Order No. 636. The Commission discussed at length the changing nature of the take-or-pay problem and the factual context at the time of Order 636. While modifying the rationale upon which it based its decision, the Commission reaffirmed Order No. 636's holding that pipelines should be allowed the opportunity to recover 100% of their GSR costs. Order 636–C, slip op. p. 72. Order 636–C left intact the method by which GSR costs are recoverable and once again did not modify or void the producer-pipeline contracts.

In light of this history of the Commission's studied and consistent refusal to modify or void producer-pipeline contracts, and under these present circumstances, I conclude, as a matter of law, that the Order 636 Series did not render ambiguous § 7.7 of the 1992 Contract.

## C. *Order 636 Series triggered § 7.7*

Next, KNGSS argues that the 1992 Contract § 7.7 was triggered by the Order 636 Series. I disagree.

By its terms, the gas price reduction portion of § 7.7 is triggered by either of two events:

1. a finding by FERC as a result of:

   a. a rate or certificate filing by Buyer; or

   b. on the Commission's own motion; or

   c. in any other manner,

   that the price herein provided is unreasonably high considering appropriate comparisons with highest contract prices for sales by large producers or the prevailing market price for intrastate sales in the same producing areas; or

2. if the Commission in any rate filing by Buyer shall disallow a portion of the price herein provided as not being a reasonable part of Buyer's cost of service.

### 1. *FERC finding of reasonableness*

KNGSS does not point to any rate change or certificate filed by KN or its successors resulting in a finding by FERC that the 1992 Contract price was unreasonable. Indeed, it is uncontested that KNGSS has never filed a rate or certificate with FERC. Nor has the Commission commented on the 1992 Contract price on its own motion or otherwise. Likewise, there can be no dispute that the 1992 Contract between KN and American is not mentioned in any FERC decision including the Order 636 Series. Indeed, Order 636 was issued virtually simultaneously with the execution of the 1992 Contract on April 8, 1992. FERC Orders 636–A, B, and C also do not mention the 1992 Contract.

KNGSS concedes, and I agree, that nothing in the Order 636 Series directly modified producer gas supply contracts. Resp. p. 9. Indeed, FERC declined expressly to determine whether the Order 636 Series triggered cost of service provisions like § 7.7. Order 636 57 F.R. ¶ 30,939 at p. 30,458. Nevertheless, KNGSS argues that the Order 636 Series should be read as finding that all prices in gas purchase contracts which are above market are unreasonably high.

The focus of the Order 636 Series was "protection of natural gas consumers from the exercise of monopoly power by pipelines...." *Id.* at p. 30,392. In this context, the Order 636 Series discussed gas supply

costs and the problems generated by take-or-pay supply contracts. The Commission referred to its previous finding that the take-or-pay problem had been "substantially resolved." Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, *FERC Statutes and Regulations, Regulations Preambles* 1986–1990 ¶ 30,867 at p. 31,523 Order No. 500–H. Order 636 authorized 100% recovery of prudently incurred GSR costs under specific circumstances. The Commission stated that "[p]ipelines must be able to show that any [gas supply realignment] costs for which they seek 100% recovery . . . have been minimized by vigorous arm's-length negotiations with their producer/suppliers." Order 636 57 F.R. ¶ 30,939 at p. 30,461. Also, the Commission considered and rejected specifically, the modification of gas producer contracts. Referring to Order Nos. 500–H and 500–I, the Commission stated it "did not choose to . . . revise producer contracts. . . ." *Id.* It also emphasized it was "very reluctant to create disincentives to producers to market their available reserves to willing buyers by requiring them to relinquish their contractual rights. . . ." *Id.* at p. 30,462.

In Order 636–A, the Commission once again addressed suggestions from members of the natural gas industry that it shift a portion of the GSR costs to producers. The National Association of State Utility Consumers Advocates argued that the Commission's use of § 5 authority to abrogate contracts between pipelines and their customers "mandate[d] equal treatment on the pipelines' supply side." Order 636–A 57 F.R. ¶ 30,950 p. 30645. Once again, the Commission did not abrogate the producer-pipeline contracts or find unreasonable the prices in such contracts. Rather it confined itself to "strongly urg[ing] the pipeline and its supplier to aim for a fair adjustment of the terms of the contract to bring it into line with current and future market conditions." *Id.* Based on the foregoing, I conclude the Order 636 Series did not find, explicitly or implicitly, that the prices in producer-pipeline contracts were unreasonable. Thus, the first § 7:7 "trigger" has not been pulled.

## 2. *Section 7.7 Disallowance*

KNGSS next argues that the second provision of § 7.7 has been met. Section 7.7 requires that the buyer make a rate filing with FERC in consideration of which FERC disallows a portion of the price as not being a reasonable part of the buyer's cost of service.

It is undisputed that KNGSS never submitted a rate filing to the Commission. However, KNGSS argues that FERC's implementation of the Order 636 Series "effectively" resulted in a "disallowance" of the 1992 Contract price. Resp. p. 31.

The parties do not dispute that KNGSS is not and never was a pipeline. However, KNGSS relies on KN's Order 636 restructuring filing which resulted in the elimination of its purchased gas adjustment clause. KNGSS argues that FERC's elimination of the purchased gas adjustment was "tantamount to a disallowance" of the 1992 Contract because it precluded KN, or its assignee, KNGSS, from passing the 1992 Contracts gas costs through to the pipeline's customers. Again, I disagree.

The Order 636 Series did not preclude the pipelines from passing through gas costs to pipeline customers. To the contrary, Orders 636 and 636–C authorize 100% recovery of prudently incurred GSR costs, including currently above market producer contracts, under specific circumstances. The Commission stated that "[p]ipelines must be able to show that any [gas supply realignment] costs for which they seek 100% recovery . . . have been minimized by vigorous arm's-length negotiations with their producer/suppliers." Order 636 57 F.R. ¶ 30,939 at p. 30,461. The Commission modified the mechanism by which the producer costs were handled. Rather than precluding the pipelines from passing through the gas costs to their customers, the Order 636 Series merely replaced the PGA mechanism with the GSR cost recovery mechanism.

The Order 636 Series confirms that KNIT would have had the opportunity to recover 100% of the costs it might have incurred to buy-out, buy-down, or perform the contract with American if it had retained the 1992 Contract and followed the Order 636 proce-

dures. It is undisputed that KNIT did not seek, pursuant to Order 636, to recover any portion of the 1992 Contract costs. Instead, KNIT chose to transfer the 1992 Contract to a non-pipeline affiliate, KNGSS, whose prices are not subject to FERC regulation, and which cannot make Order 636 cost recovery filings. When KNGSS took the 1992 Contract, it accepted its burdens as well as its benefits. I conclude that FERC took no action which could be characterized as a "disallowance" of the 1992 Contract prices which would result in triggering § 7.7.

Accordingly, it is ORDERED that:

1. defendants' motion for summary judgment is granted on plaintiff's claims one, two, and three;

2. judgment shall enter in favor of defendants against plaintiffs on its complaint; and

3. upon submission of a bill of costs within 10 days of this Order's date, defendants are awarded costs.